863 A.2d 455

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William GRIBBLE, Appellant.**

**Nos. 336 CAP & 356 CAP.**

Supreme Court of Pennsylvania.

Submitted Oct. 10, 2002.

Decided Dec. 21, 2004.

648

650

652

Hugh J. Burns, Esq., Philadelphia, Amy Zapp, Esq., Harrisburg, for Commonwealth of Pennsylvania, in 356 CAP.

Mitchell S. Strutin, Esq., Philadelphia, Ramy I. Djerassi, Esq., for William Gribble, in 356 CAP.

Mitchell S. Strutin, Esq., Philadelphia, Ramy I. Djerassi, Esq., for William Gribble, in 336 CAP.

Hugh J. Burns, Esq., Philadelphia, Amy Zapp, Esq., Harrisburg, for Commonwealth of Pennsylvania, in 336 CAP.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice CASTILLE.

In these consolidated cross-appeals, appellant William Gribble appeals the denial, in part, of his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*, while the Commonwealth, as cross-appellant, appeals that portion of the PCRA court's order granting appellant a new sentencing hearing. For the reasons that follow, we vacate the order below and remand to the PCRA court for an evidentiary hearing consistent with this Opinion.

In November 1992, appellant and his girlfriend and co-defendant, Kelly O'Donnell, were staying in the Philadelphia apartment of Agnes McClinchey, appellant's mother, who was out of town at the time. At approximately 10:00 p.m. on

November 11, 1992, O'Donnell went to a pizza shop owned by the victim, Eleftherios Eleftheriou, and offered to pawn her leather jacket to him for cash. Eleftheriou gave O'Donnell a handful of cash, and the two made arrangements to meet again later that evening. After closing the pizza shop, Eleftheriou met O'Donnell at a street corner and then accompanied her to the apartment. That evening, appellant and O'Donnell murdered Eleftheriou, dismembered his body, and stole from him some money and a credit card. The next day, appellant used the credit card to buy some articles of clothing for his children.

On November 13, 1992, the police were called to a dump on North Delaware Avenue in Philadelphia where they recovered several bags of dismembered body parts, later identified as the partial remains of Eleftheriou, along with a letter addressed to Ms. McClinchey. Later that day, the police responded to a report of a burning car on Delaware Avenue and recovered from the car two severed legs and a lower torso with the penis missing, later identified as further remains of Eleftheriou.

After McClinchey returned home to her apartment from out of town, the police interviewed her at a nearby gas station. McClinchey told the police that after she had returned home, O'Donnell had told her, in appellant's presence, that O'Donnell and appellant were involved in Eleftheriou's murder. Furthermore, McClinchey had overheard appellant and O'Donnell planning to burn the car that the police had found before they came to interview her.

Thereafter, the police arrested both appellant and O'Donnell. Following the arrests, the police searched the apartment and recovered a chisel, a claw hammer, and a serrated knife— each having traces of human tissue and blood matching that of the victim—from the apartment basement where it was determined that the victim had been dismembered. In addition, the police found a pencil case containing the victim's severed penis. At police headquarters, both appellant and O'Donnell

confessed separately, each claiming to be the sole killer.[1] Each also stated that the other had assisted only in disposing of the body.

Appellant and O'Donnell were tried jointly in a non-jury trial presided over by the Honorable Paul Ribner. At trial, the Commonwealth presented expert testimony from an assistant medical examiner that the initial blow to Eleftheriou's head knocked him unconscious and that every blow thereafter was inflicted upon a head that was not moving. The expert further testified that red abrasions in the areas where the head and right arm were severed indicated that the victim's heart was still beating when those body parts were severed. The expert concluded that, because the victim was a muscular man, one person acting alone could not have removed both the head and the arm in fifteen minutes, which was the amount of time it would have taken for the victim to bleed to death.

On June 30, 1993, following trial, both appellant and O'Donnell were convicted of first degree murder, criminal conspiracy, possessing instruments of a crime, robbery, theft by unlawful taking, unauthorized use of an automobile, arson, risking a catastrophe, forgery, abuse of a corpse, and credit card fraud. On that same day, both appellant and O'Donnell waived their rights to a penalty phase jury, and the trial judge conducted and concluded a joint penalty phase hearing. In appellant's case, the trial judge found that one proven aggravating circumstance outweighed two mitigating circumstances, and accordingly, sentenced appellant to death.[2] O'Donnell

1. According to appellant, he came home to the apartment to find Eleftheriou "feeling all over" O'Donnell on the couch. N.T., 6/29/93 at 307. Appellant stated that he "freaked" and beat Eleftheriou with a hammer until he knew he was dead and that he later dismembered Eleftheriou's body. *Id.* at 307–10. O'Donnell, on the other hand, claimed in her statement that she killed Eleftheriou because he was "slimy" and because he had once pulled out his penis and rubbed it on her. *Id.* at 271–79. She stated that she took Eleftheriou to the apartment; hit him with a hammer when he was not looking and then beat him repeatedly; and dismembered his body. *Id.*

2. The aggravating circumstance was that appellant committed the killing in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); and the two mitigating circumstances were that appellant had no significant history

was also sentenced to death. On August 11, 1994, the trial court denied appellant's post-trial motions and sentenced him on the remaining offenses. On direct appeal, this Court affirmed the convictions and sentence of death. *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (1997) (*Gribble I*).[3] Appellant was represented by Charles Mirarchi, III, Esq., at trial and by Mirarchi and Isla A. Fruchter, Esq., throughout his direct appeal.

On November 16, 1998, the United States Supreme Court denied certiorari. *Gribble v. Pennsylvania*, 525 U.S. 1005, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998). On November 19, 1998, appellant timely filed a *pro se* petition for relief under the PCRA and requested that R. Nicholas Gimble, Esq., be appointed to represent him. On December 15, 1998, the trial court granted a motion to stay execution, filed on appellant's behalf by Attorney Fruchter. On April 19, 1999, the court appointed Ramy I. Djerassi, Esq., to represent appellant. Appellant filed a counseled amended petition for PCRA relief on December 22, 1999, in which he claimed that he was entitled to a new penalty phase hearing due to trial counsel's ineffective assistance in failing to object to a defective jury waiver colloquy and in failing to present additional mitigation evidence. A supplemental amended petition was filed on March 28, 2000, which claimed, *inter alia*, that trial counsel was ineffective for withdrawing a pre-trial severance motion and for not objecting to certain hearsay admitted at trial. Arguments were heard before the Honorable James A. Lineberger, but no evidentiary hearing was granted. On March 21, 2001, the PCRA court entered an order granting appellant a new penalty hearing based on his claim of counsel ineffec-

of prior criminal convictions, *id.* § 9711(e)(1), and that he had a drug addiction. *Id.* § 9711(e)(8).

3. O'Donnell appealed separately. This Court affirmed O'Donnell's conviction but vacated her death sentence and remanded for a new penalty phase hearing, holding that the record did not adequately demonstrate that O'Donnell's waiver of her right to a penalty-phase jury was knowing and voluntary. *See Commonwealth v. O'Donnell*, 559 Pa. 320, 740 A.2d 198, 211–14 (1999). The decision in that case is discussed further, *infra*.

tiveness in failing to object to the jury waiver colloquy. The PCRA court denied all of appellant's remaining claims.

On this appeal, appellant raises three claims sounding in the ineffective assistance of trial counsel. Specifically, appellant faults counsel for: (1) withdrawing his pre-trial motion to sever appellant's trial from O'Donnell's; (2) failing to object to the trial court's admission of out-of-court statements which co-defendant O'Donnell made to Agnes McClinchey; and (3) failing to perform a reasonable investigation and failing to locate available family members with evidence material to mitigating circumstances for purposes of the penalty phase. On its penalty phase cross-appeal, the Commonwealth claims that the PCRA court erred in awarding a new penalty hearing on appellant's claim of counsel ineffectiveness for failing to object to the penalty phase jury waiver colloquy. For ease of discussion, we shall first address appellant's two claims involving the guilt phase and then the parties' cross-claims involving the penalty phase.

## GUILT PHASE

All of the claims on this appeal involve allegations that appellant's trial counsel was ineffective. Although appellant does not make clear whether he raises these claims under the Pennsylvania Constitution, the federal Constitution, or both, we shall assume that he intends to raise them under both charters. It is settled that the test for counsel ineffectiveness is the same under both the Pennsylvania and Federal Constitutions: it is the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also Bell v. Cone*, 535 U.S. 685, 694–96, 122 S.Ct. 1843, 1850–52, 152 L.Ed.2d 914 (2002); *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 855 (2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004); *Commonwealth v. Busanet*, 572 Pa. 535, 817 A.2d 1060, 1066 (2002), *cert. denied*, 540 U.S. 869, 124 S.Ct. 192, 157 L.Ed.2d 126 (2003); *Commonwealth v. (Charles) Pierce*, 515 Pa. 153, 527 A.2d 973 (1987). *Accord Rompilla v. Horn*, 355 F.3d 233, 246–50 (3d Cir.2004), *cert. granted on other grounds*, —— U.S.

——, 125 S.Ct. 27, 159 L.Ed.2d 857 (2004); *Werts v. Vaughn,* 228 F.3d 178, 203 (3d Cir.2000), *cert. denied,* 532 U.S. 980, 121 S.Ct. 1621, 149 L.Ed.2d 483 (2001).

■■■ To better focus the *Strickland* analysis, this Court has applied the performance part of the test by looking both to the arguable merit of the claim lodged against counsel as well as the objective reasonableness of the path taken, or not taken, by counsel. *E.g., Bomar,* 826 A.2d at 855 n. 19. Thus, the constitutional ineffectiveness standard requires the defendant to rebut the presumption of professional competence by demonstrating that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. (Michael) Pierce,* 567 Pa. 186, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *(Michael) Pierce,* 786 A.2d at 221–23; *see also Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met.").[4]

■■■ Appellant first claims that trial counsel was ineffective for withdrawing a motion to sever his case from that of his co-defendant and paramour, Kelly O'Donnell. Appellant argues that counsel should have asserted that he was entitled to a separate trial because he was prejudiced by the "evidentiary dilemma" created by the co-defendants' allegedly antagonistic defenses. Specifically, appellant argues that his "heat of

4. This Court's approach to "layered" claims of ineffectiveness, as set forth in *Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651 (2003), and *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), is not implicated here because appellant was not represented by new counsel on direct appeal.

passion" defense was directly contradicted by O'Donnell's confession, admitted against her at the joint trial, in which she stated that she alone had committed the killing. The Commonwealth counters that appellant litigated a variation of this claim on direct appeal and is thus barred from raising it again under the guise of an ineffective assistance of counsel claim. The PCRA court agreed with the Commonwealth and found that this Court's merits decision on direct appeal in *Gribble I,* 703 A.2d at 426, rendered the claim previously litigated.

Previously litigated allegations of error are not reviewable under the PCRA. 42 Pa.C.S. § 9543(a)(3); *Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1183 (1999); *Commonwealth v. Chester,* 557 Pa. 358, 733 A.2d 1242, 1253 (1999); *Commonwealth v. Szuchon,* 534 Pa. 483, 633 A.2d 1098, 1099 (1993); *Commonwealth v. Carpenter,* 533 Pa. 40, 617 A.2d 1263, 1266 (1992). An allegation of error has been "previously litigated" if the "highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

Here, appellant argued on direct appeal that the admission of O'Donnell's confession against her during the joint trial, where O'Donnell did not testify, deprived him of his right of confrontation in violation of the Sixth Amendment of the United States Constitution and the United States Supreme Court's holding in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (in joint trial, admission of non-testifying co-defendant's confession, which explicitly names and powerfully incriminates defendant and is not admissible under any recognized hearsay exception, violates defendant's right of confrontation). In rejecting the claim, this Court found that: "O'Donnell's confession did not inculpate [appellant]. In fact, O'Donnell's confession, if believed, would completely *exculpate* [appellant] from any involvement in the killing." *Gribble I,* 703 A.2d at 437. Since the statement did not inculpate appellant, we concluded that there was no violation of the right of confrontation. *Id.*

The allegation of error underlying appellant's current ineffectiveness claim is very similar to the *Bruton* claim he

litigated on direct appeal. Where appellant there complained of a confrontation clause issue arising from the admission of O'Donnell's confession at the joint trial, he now alleges that counsel should have preempted the problem entirely by seeking severance. Severance (along with redaction of the confession, exclusion of the confession, limiting charges, etc.) is one of several theoretical ways in which the underlying confrontation/ *Bruton* style issue may be addressed or remedied. Though the specific remedial precaution differs, the trial issue sought to be avoided is the same: *i.e.*, the potential for spillover prejudice arising from admission of a non-testifying co-defendant's confession in a joint trial. Thus, appellant's litigation of the confrontation claim on direct appeal necessarily involved an issue that is also at the heart of appellant's current underlying severance argument—*i.e.*, that the admission of O'Donnell's confession against her inculpated and thereby prejudiced appellant. Consideration of appellant's ineffectiveness/severance claim necessarily requires this Court to examine the potential harmful effect of O'Donnell's statement, a task we previously undertook on appellant's direct appeal. *See* 703 A.2d at 437. Since our finding on direct appeal was based upon an assessment of the effect of O'Donnell's statement, and the present claim of counsel ineffectiveness could only succeed if we reached a contrary determination that the statement was, in fact, prejudicial to appellant, the PCRA court did not err in finding this claim to be previously litigated. *See also Albrecht,* 720 A.2d at 703.

In any event, even if it is assumed that the instant claim, which sounds in counsel ineffectiveness rather than in evidentiary/confrontation clause restrictions, is sufficiently distinct to escape the effect of the statutory previous litigation bar, the claim fails on the merits. Severance is proper where a party can demonstrate that a joint trial would prejudice him. Pa.R.Crim.P. 583; *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1372–73 (1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). In determining whether to grant a motion to sever, the likelihood of antagonistic defenses is one factor for the trial court to consider. *Id.; see also Common-*

*wealth v. Morales,* 508 Pa. 51, 494 A.2d 367 (1985). However, as this Court stated in *Chester:*

> [M]ore than a bare assertion of antagonism is required.... The mere fact that there is hostility between defendants, or that one may try to save himself at the expense of another, is in itself not sufficient grounds to require separate trials.... In fact, ... the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together.

587 A.2d at 1373 (citations omitted). The central inquiry is always whether undue prejudice has inured to the defendant. *See Morales,* 494 A.2d at 373.

Here, as this Court found on direct appeal, appellant was not prejudiced by being tried jointly with O'Donnell. First, this was a bench trial. The learned trial judge is assumed to be able to separate the evidence that was admitted against the co-defendant alone and that which was admitted against appellant. Appellant's present claim of prejudice is premised upon an assumption that the trial judge was unable to consider the evidence only for its intended evidentiary purpose. That assumption is contrary to settled law. *See Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 71 n. 19 (2003) (judge sitting as fact finder is presumed to disregard inadmissible evidence and consider only competent evidence).

█ Moreover, even if this Court were to indulge appellant's assumption that the trial judge ignored his duty and considered O'Donnell's confession as evidence against appellant, this does not prove counsel's ineffectiveness in withdrawing the severance motion. As this Court found on direct appeal, O'Donnell's confession did not inculpate appellant, but instead, tended to exonerate him. Hence, the severance theory underlying appellant's present claim of ineffective assistance of counsel fails for the same reason appellant's *Bruton* theory failed on direct appeal. *See Gribble I,* 703 A.2d at 436–37. Just as severance is not required where "one may try to

save himself at the expense of the other," *Chester*, 587 A.2d at 1373, neither is it required where, as here, one has tried to save the other at the expense of himself.

Furthermore, appellant's contention that O'Donnell's confession detracted from the credibility of his "heat of passion" defense, and thereby provided a basis for counsel to seek severance, loses force when the actual trial record is examined. In his summation, appellant's trial counsel argued to the court that O'Donnell had lied to the police, that she was incapable of killing the victim, and that appellant had committed the killing in the heat of passion—*i.e.*, that appellant was not guilty of first degree murder, but rather only of voluntary manslaughter. N.T., 6/30/93 at 506–07. But, appellant's trial counsel also argued, in the alternative, that O'Donnell's statement could be believed and that appellant was not guilty at all, *i.e.*, he did not participate in the killing. *Id.* Significantly, O'Donnell's trial counsel also argued in closing that her confession should be disbelieved. *Id.* at 509–15. O'Donnell's counsel argued that O'Donnell lacked motive; that she was incapable of killing and dismembering the victim due to the physical deformity of her hands; and that she was, in fact, innocent of the crime. *Id.* at 513–15. The potential for spillover prejudice from O'Donnell's confession was surely reduced when O'Donnell's defense challenged the contents of the confession. Because appellant has not shown that he was prejudiced by the joint trial, trial counsel cannot be deemed ineffective for withdrawing the motion to sever trials.[5]

■ Appellant's second guilt-phase claim is that trial counsel was ineffective for failing to object to the admission of hearsay evidence that allegedly violated appellant's Sixth Amendment right to confrontation. This claim involves a statement made by O'Donnell to McClinchey following the

5. Trial counsel filed the motion to sever on February 18, 1993, but withdrew it the next day. It is notable that the motion stated that O'Donnell's statements were prejudicial to appellant only because they allegedly "implicate[d]" him. Motion to Sever, R.R., D–9, at 1–2, ¶ 3. O'Donnell's confession, in fact, tended to exculpate appellant. Because the motion counsel actually filed lacked factual merit, he cannot have been ineffective for withdrawing it.

murder, in appellant's presence and before O'Donnell and appellant were arrested. McClinchey testified as follows:

[Prosecutor]: What happened after you got home and got into your house?

[McClinchey]: ... [T]he phone rang and Giny [O'Donnell] had answered it and told—had a conversation that there was a murder committed and they had found a head on Delaware Avenue.

[Prosecutor]: How did you know what the conversation was about?

[McClinchey]: Because she had told me that they had found a head on Delaware Avenue; that they were involved in the murder.

Appellant's trial counsel objected to McClinchey's testimony, but only as to the use of the word "murder" and not on Sixth Amendment grounds. N.T., 6/29/03, at 411–12.

█ Appellant now argues that O'Donnell's out-of-court statement, repeated by McClinchey on the stand, violated his right to confront O'Donnell and was therefore inadmissible against him.[6] Appellant claims that the admission of that hearsay statement was unconstitutional because the statement does not satisfy the two-prong test articulated by the United States Supreme Court in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In *Roberts*, the Court held that an out-of-court statement by a non-testifying co-defendant, which inculpates the defendant and is admitted against the defendant at trial, is admissible—and hence not violative of Confrontation Clause—only if: (1) the statement falls under a "firmly rooted" hearsay exception; or (2) the statement comes with "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at 2539. The Commonwealth counters that O'Donnell's statement was admissible against appellant as an implied or "adoptive" admission and, in the alternative, as a statement made by a co-conspirator "during the course and in the furtherance of the conspiracy." Thus, counsel cannot have

6. The Commonwealth does not dispute that O'Donnell's statement was offered into evidence against appellant as well as against O'Donnell.

been ineffective in failing to challenge the admissibility of the statement. The PCRA court denied relief, finding that the statement did not prejudice appellant because it did not conflict with his defense that he had committed the killing, but in the heat of passion.

██ Because this claim sounds in ineffective assistance of counsel, appellant must demonstrate that counsel was incompetent under the law in existence at the time of trial. Counsel cannot be deemed ineffective for failing to predict developments or changes in the law. *See Commonwealth v. Ogrod,* 576 Pa. 412, 839 A.2d 294 (2003); *Commonwealth v. Carpenter,* 555 Pa. 434, 725 A.2d 154 (1999). In arguing that the underlying confrontation clause claim has merit, appellant relies, in part, upon this Court's decision in *Commonwealth v. Young,* 561 Pa. 34, 748 A.2d 166 (1999), which was decided six years after appellant's trial. In *Young,* this Court, on reargument, considered the impact of the United States Supreme Court's then-recent plurality decision in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality). To the extent that appellant's argument relies on *Lilly* and *Young,* it necessarily fails. Appellant cannot demonstrate that trial counsel was ineffective on the basis of Sixth Amendment jurisprudence first articulated in later cases.[7]

At the time of this trial, Sixth Amendment jurisprudence did not foreclose the possibility that a recognized hearsay

---

**7.** It is also notable that the cases relied upon by appellant themselves have been called into question by more recent U.S. Supreme Court authority. In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court expressly overruled *Roberts,* acknowledging confusion and uncertainty in the law resulting from inconsistent and illogical applications of the *Roberts* test. The Court adopted the following new standard: where "testimonial hearsay"—which "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations"—is sought to be admitted against a defendant, the only indicium of reliability sufficient to satisfy the Sixth Amendment and permit the admission of the hearsay is "confrontation." *Id.* at ——, 124 S.Ct. at 1374. The question of how the *Crawford* rule will affect cases involving nontestimonial hearsay, such as is at issue here, is unclear at this time. We need not concern ourselves with that question, as this is a collateral attack, and *Crawford* does not apply.

exception could permit the admission into evidence of an unavailable co-defendant's out-of-court statement, offered against and inculpating the defendant, without violating the Confrontation Clause. *See Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539; *see also Bruton,* 391 U.S. at 129 n. 3, 88 S.Ct. at 1624 n. 3 ("We emphasize that the hearsay statement inculpating [Bruton] was clearly inadmissible against him under traditional rules of evidence. . . . There is not before us, therefore, any recognized exception to the hearsay rule . . . and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause."). As articulated in *Roberts,* at the time of appellant's trial, the statement of an unavailable hearsay declarant was deemed admissible against the defendant, and not violative of the Confrontation Clause, if it bore adequate "indicia of reliability," which can be inferred where the statement falls into a "firmly rooted hearsay exception." *Id.* at 66, 100 S.Ct. at 2539. Indeed, the statements in *Roberts,* offered and admitted under an Ohio hearsay exception for prior testimony, were found to satisfy the test set forth by the Court. *Id.*

Likewise, at the time this case was tried, both the U.S. Supreme Court and this Court had recognized that statements admitted under the co-conspirator exception to the hearsay rule do not violate the Sixth Amendment. *See Bourjaily v. United States,* 483 U.S. 171, 183–84, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987) ("co-conspirators' statements . . . have a long tradition of being outside the compass of the general hearsay exclusion . . . [T]he Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of [such] statements."); *Commonwealth v. Coccioletti,* 493 Pa. 103, 425 A.2d 387, 392 (1981) (statements of unavailable accomplice admitted against defendant under Pennsylvania hearsay exception for statements of co-conspirator did not violate Sixth Amendment; co-conspirator exception applies where accomplice liability is proven and extends to statements made after completion of conspiratorial object in effort to escape or evade detection, even where no conspiracy charged); *cf. Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27

L.Ed.2d 213 (1970) (Georgia rule of evidence permitting admission into evidence of co-conspirator statements made "during the pendency of the criminal project," while certainly not identical to traditional co-conspirator exception, nonetheless satisfied Confrontation Clause).

The firmly rooted hearsay exceptions which the Commonwealth argues are applicable here are the implied or adoptive admission exception and the co-conspirator exception. Both of these hearsay exceptions are recognized in Pennsylvania Rule of Evidence 803. Rule 803 provides that, "[t]he following statements, as hereinafter defined, are not excluded by the hearsay rule, even though the declarant is unavailable." The twenty-fifth exception listed within Rule 803 is designated, "Admission by Party–Opponent," and it encompasses both of the exceptions urged by the Commonwealth, as follows:

(25) **Admission by Party–Opponent**

The statement is offered against a party and is ... (B) a statement of which the party has manifested an adoption or belief in its truth, ... or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

*Id.*

Both of these party admission exceptions were addressed by this Court in *Coccioletti.* There, co-defendants Coccioletti and Garrity, who had been drinking heavily, stood on the side of the road while one or both of them fired gunshots across the road as traffic passed. The victim, who was driving by in a truck, was struck in the back of the head with a bullet and killed. Following the incident, the co-defendants and a friend were in a car on their way to a restaurant when they passed the victim's truck, which had crashed. Coccioletti stated that he felt badly about the truck because he had tossed a firecracker at it. Later, Garrity asked Coccioletti what they were going to do with the guns, and Coccioletti responded that they would concoct a story as to where the guns were at the time of the shooting. At their joint trial, the friend who had overheard these statements testified as to what he had heard, and

all of the statements were admitted against both co-defendants, neither of whom testified. Both men were convicted of third degree murder.

On their joint appeal, the co-defendants each raised a Sixth Amendment challenge, alleging that their respective rights of confrontation were violated because neither had the ability to cross-examine the other at trial. In rejecting that argument, this Court first addressed the applicability of the co-conspirator exception:

> [I]n Pennsylvania, the out-of-court declarations of one co-conspirator can be admitted against another co-conspirator provided that the declarations were made during the conspiracy and in furtherance of the common design.... This Court has extended the co-conspirator exception to admit declarations by "co-participants" in a crime even where conspiracy has not been charged or proven. Appellants were co-participants in the crime: this has been established.... The declarations were made in the course of concealing evidence and in furtherance of [the] common design of evading capture. Although the co-conspirator exception ... has not been applied when the declarations are made after arrest and termination of the conspiracy, the appellant's [sic] declarations in this case were made prior to their arrest while the conspiracy was still in progress. We conclude that appellants' declarations fall within the Pennsylvania co-conspirator exception to the hearsay rule....

*Coccioletti*, 425 A.2d at 392 (citations omitted). We further concluded that the adoptive or implied admission exception also applied:

> [T]here is an additional basis for admitting the hearsay testimony. Appellants' inculpatory declarations were made in each other's presence, and if incorrect, would naturally have been denied. Pennsylvania follows a traditional exception to the hearsay rule which admits such declarations as implied admissions by the silent and acquiescing accused.

*Id.*

Here, as in *Coccioletti*, the co-defendants were in each other's presence and had not yet been arrested when O'Don-

nell's inculpatory statement was uttered and, according to McClinchey, appellant did not deny the statement. Furthermore, later that day O'Donnell instructed appellant, while within McClinchey's earshot, to burn a car—later discovered to be the car in which O'Donnell and appellant had put some of the victim's dismembered body parts. *See* N.T., 6/29/93, at 415. In addition, McClinchey overheard O'Donnell expressing relief that appellant had not been caught after returning from burning the car. *Id.* at 417. O'Donnell's earlier statement to McClinchey that O'Donnell and appellant were "involved" in the murder clearly was "made in the course of concealing evidence and in furtherance of [the] common design of evading capture" and it was the sort of statement which, "if incorrect, would naturally have been denied" by appellant. *Coccioletti,* 425 A.2d at 392. Thus, in light of *Coccioletti,* O'Donnell's out-of-court statement was admissible under both the co-conspirator exception and the adoptive admission exception. Furthermore, the extension of the co-conspirator exception to cover acts following the completion of the conspiratorial object is far less attenuated here than it was in *Coccioletti* because here, unlike *Coccioletti,* the joint attempt to evade capture included further crimes, such as arson and risking a catastrophe. In light of the controlling law in existence at the time of trial, counsel cannot be deemed ineffective for failing to object to O'Donnell's out-of-court statement to McClinchey.

This conclusion is buttressed by appellant's own argument. Appellant concedes that "[r]egarding the first prong of the *Roberts* test, hearsay was not given to 'authorities' and therefore Agnes McClinchey's testimony would appear to pass muster, at least under the language of *Young.*" *See* Appellant's Brief, at 19.[8] Appellant submits that O'Donnell's out-of-

8. Appellant alludes to this Court's holding in *Young, supra,* where we concluded:

We find that a majority of the [United States Supreme] Court would agree that **statements made to the authorities** by a nontestifying accomplice which inculpate the defendant more than the accomplice are not admissible pursuant to a firmly rooted exception to the hearsay doctrine and thus do not satisfy the first prong of the *Roberts* test.

court statement needed to satisfy **both** prongs of the *Roberts* test—*i.e.*, that it must fall within a "firmly rooted" exception to the hearsay rule **and** must come with "particularized guarantees of trustworthiness." On the contrary, *Roberts* articulated a disjunctive rule: it required only that a given statement bear sufficient "indicia of reliability," as shown **either** by the fact that the statement falls under a "firmly rooted" hearsay exception **or** by "particularized guarantees of trustworthiness." 448 U.S. at 66, 100 S.Ct. at 2539. Thus, appellant's own argument appears to concede, as we have already concluded, that this case involves an out-of-court statement covered by then-firmly rooted exceptions, unlike those statements later found to violate the standards set forth in *Lilly* and *Young*.

## PENALTY PHASE

■ The PCRA court summarily granted appellant relief upon his claim that trial counsel was ineffective for failing to object to the penalty phase jury waiver colloquy, while denying relief, in equally summary fashion, on his alternative claim that counsel was ineffective in his investigation and presentation of mitigation evidence. If this Court were to decide that the Commonwealth's cross-appeal challenging the grant of penalty phase relief is meritless, there would be no need to reach appellant's alternative penalty phase claim. Accordingly, we shall address the Commonwealth's cross-appeal first.

In explaining its grant of a new sentencing hearing, the PCRA court reasoned as follows:

> Defendant asserts in his amended PCRA petition that trial counsel was ineffective for failing to protect his client against involuntary jury waiver at the penalty phase and compounded that error by failing to preserve and raise it on appeal. The Supreme Court vacated the death sentence of co-defendant, Kelly O'Donnell, *Commonwealth v. O'Donnell,* 559 Pa. 320, 740 A.2d 198 (1999). Critical to defendant's

*Young,* 748 A.2d at 191 (emphasis added) (construing *Lilly,* 527 U.S. at 116, 119 S.Ct. at 1887). The statement here was not made to the authorities.

case was the holding in *O'Donnell* that the trial court had not given a colloquy at the penalty phase sufficient to determine whether the co-defendant was voluntarily waiving her right to a jury. The defendant was standing next to Ms. O'Donnell and was given the same colloquy. Since the Supreme Court ruled that "... the colloquy [was] insufficient to establish a knowing, intelligent, and voluntary waiver of [defendant's] right to a sentencing jury" in the penalty phase of the trial, a new penalty phase hearing is mandated. PCRA Court Slip Op. at 2. The PCRA court did not apply the settled performance and prejudice standard governing claims of ineffective assistance in granting relief. Instead, the court concluded that, since the record waiver colloquy for appellant and O'Donnell was the same, and O'Donnell was granted relief on direct review, *ipso jure*, appellant is entitled to relief on collateral review. The question, however, is not so elemental.

The Commonwealth correctly notes that neither O'Donnell nor appellant objected to the waiver colloquy at the penalty hearing, and that each therefore waived any direct challenge to its sufficiency. *See* N.T., 6/30/93, at 544–546. The Commonwealth also correctly notes that O'Donnell prevailed upon her waived claim on direct appeal only because she enjoyed the benefit of the then-available "relaxed waiver" rule.[9] In contrast, the Commonwealth notes that relaxed waiver is unavailable upon this collateral attack, *see Albrecht,* 720 A.2d at 700 (abrogating relaxed waiver on PCRA review); thus, appellant cannot pursue this claim as if it were a preserved claim of trial court error. Instead, appellant's challenge to the

9. Under the direct capital appeal relaxed waiver rule, this Court had discretion to reach alleged trial court errors which, although waived, were resolvable from the record. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In O'Donnell's direct appeal, this Court found that the failure to raise a contemporaneous objection to the colloquy did not prevent review of the merits of the claim. 740 A.2d at 211 n. 11. Accordingly, we proceeded to the merits of the waived claim. Thus, in essence, the *O'Donnell* Court proceeded as if O'Donnell had objected to the colloquy and the trial court had overruled that objection. We note that, in *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), this Court abrogated the relaxed waiver rule on direct capital appeals, but did so in prospective fashion.

colloquy is cognizable under the PCRA only through the distinct lens of ineffective assistance of counsel. The Commonwealth argues that, in granting relief, the PCRA court failed to apply the governing *Strickland/Pierce* standard and, as a result, failed to recognize that a claim of counsel ineffectiveness is more difficult to sustain than a claim of trial court error. Applying the settled test, the Commonwealth argues that appellant failed to prove that his counsel was ineffective in causing or permitting appellant to waive his right to a penalty phase jury in an unknowing and involuntary fashion.

Appellant counters that he was similarly situated to O'Donnell and that the PCRA court properly granted him collateral relief on the basis of this Court's disposition of O'Donnell's direct appeal, which passed upon the adequacy of the same colloquy.[10] On the question of whether he was prejudiced by counsel's failure to challenge the colloquy, appellant avers that, upon remand in O'Donnell's case, a penalty phase jury returned with a sentence of life imprisonment without parole. Appellant suggests that that result proves that he was prejudiced by counsel's failure to object to the colloquy.[11]

**10.** Appellant devotes the bulk of his Brief of Cross–Appellee to a separate argument that, in these "extraordinary circumstances," he should be entitled to the benefit of relaxed waiver. Thus, rather than evaluate his claim under the test for counsel ineffectiveness, appellant submits that he should be treated as if his collateral review situation were identical to O'Donnell's situation on direct review. Not to afford him identical treatment, appellant argues, would introduce an element of arbitrariness into capital sentencing and would deny him due process and equal protection. However, appellant did not claim that he was entitled to the benefit of relaxed waiver below, instead, he raised and prevailed upon this claim as a preserved and cognizable claim of trial counsel ineffectiveness. Nor did appellant ever raise the distinct claim below that a failure to treat him identically to O'Donnell would be arbitrary and would violate equal protection and due process. We will not resurrect the relaxed waiver rule on this collateral appeal to rule upon a different and distinct constitutional claim than the claim pursued below. *See, e.g., Commonwealth v. Edmiston,* 578 Pa. 284, 851 A.2d 883, 888 n. 5 (2004); Pa.R.A.P. 302(a). Nor will we indulge the fiction that appellant preserved a challenge to the waiver colloquy when, in fact, he did not. The only preserved and cognizable version of the claim at issue on the cross-appeal sounds in the ineffective assistance of counsel in failing to challenge the waiver colloquy.

**11.** In arguing that prejudice may be measured by the fortuity of what occurred upon remand in *O'Donnell,* appellant misconceives the inqui-

In evaluating the propriety of the PCRA court's grant of relief, we necessarily begin with a review of our decision in *O'Donnell.* O'Donnell claimed that her penalty phase jury waiver was invalid because she did not "personally waive" the right *(i.e.,* her counsel informed the court that she was waiving a jury) and because the trial court did not conduct a colloquy concerning the right to a penalty phase jury. In finding merit in this claim, this Court began by noting that, under Pennsylvania law, a capital defendant who waives a guilt phase jury still has a statutory right to a penalty phase jury.[12] We then acknowledged that this Court had never addressed the proce-

ry. The underlying right at issue is the right to make a knowing and voluntary decision whether to proceed by judge or by jury; vindication of that right does not depend upon the outcome. Thus, for example, if O'Donnell had been sentenced to death again upon remand, that fact would not require rejection of appellant's claim as a matter of law.

12. The *O'Donnell* Court noted that, under then-governing U.S. Supreme Court precedent, a capital defendant did not have a federal constitutional right to be sentenced by a jury, but instead, the states were free to determine whether judge or jury should have that responsibility. 740 A.2d at 212 (citing *Spaziano v. Florida,* 468 U.S. 447, 464–65, 104 S.Ct. 3154, 3164–65, 82 L.Ed.2d 340 (1984)). The Pennsylvania Sentencing Code explicitly grants the right to invoke a sentencing jury, even if the defendant has waived a guilt phase jury or pleaded guilty. 42 Pa.C.S. § 9711(b).

In subsequent decisions, the U.S. Supreme Court has held that the Sixth Amendment requires that capital defendants are entitled to demand that a jury determine any fact (such as the existence of aggravating circumstances) upon which the legislature conditions an increase in punishment. *Ring v. Arizona,* 536 U.S. 584, 589, 602, 122 S.Ct. 2428, 2432, 2439, 153 L.Ed.2d 556 (2002) ("Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment;" "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt.") *(applying Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *overruling Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)). In *Apprendi,* the Court had held in a noncapital case that any fact which increases the maximum penalty, other than a prior conviction, must be available for submission to a jury and proof beyond a reasonable doubt. 530 U.S. at 490, 120 S.Ct. at 2362–63. Recently, the Court held that *Ring* does not apply retroactively. *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). In any event, since Pennsylvania already conferred the right by statute, the change in law occasioned by *Ring,* but then limited by *Schriro,* is of no effect here.

dural requirements for a valid penalty phase jury waiver under Pennsylvania law. Ultimately, the *O'Donnell* Majority held that the principles which governed jury waivers generally should also apply in the specific realm of the waiver of a penalty phase jury. 740 A.2d at 212. Thus, we announced that such waivers must be knowing, voluntary, and intelligent (a standard deriving from waivers of constitutional rights); and that, to ensure that the substantive standard was met, there should be an on-the-record colloquy with the defendant. The Majority stressed that "a colloquy envisions an effort to ascertain whether the defendant understands the nature of the right he seeks to forfeit as well as the consequences of such a waiver." *Id.* at 212–13. We further described the necessary content of the colloquy as follows:

> While we do not provide a mechanical listing of what must be included in a colloquy regarding a capital defendant's waiver to a penalty-phase jury, it is clear that the colloquy must be an on-record dialogue, which is calculated to insure the defendant comprehends the nature and significance of the right being waived. At the very least, the defendant should be asked if he understands that he has the right to be sentenced by a penalty-phase jury, and whether any waiver to that right has been based on promises or coercion. Given the unique role a sentencing jury plays in the penalty phase of a capital case . . ., it also seems appropriate for any colloquy preceding a trial court's acceptance of a capital defendant's waiver to a penalty-phase jury to inform the defendant of the requirement under Pennsylvania law that a penalty-phase jury render a unanimous verdict. The defendant should be asked, in other words, whether he understands that, if elected, a twelve member jury would be required to unanimously agree that a sentence of death is appropriate before imposing such a verdict on a defendant. *See* 42 Pa.C.S. § 9711(a)(4); 42 Pa.C.S. § 9711(c)(1)(v). . . .

*Id.* at 213–14 (citations omitted).

Applying the waiver/colloquy test it had announced, the Majority found that O'Donnell's waiver was deficient because there was no meaningful personal colloquy of her or any

record indication that she understood the significance of her jury waiver. We noted that: "the trial court did not ask [O'Donnell,] for example, if she understood that she had a right to be sentenced by a jury, whether she was voluntarily giving up such a right or whether she understood what waiving that right would mean. [O'Donnell] was not asked if she had discussed a decision to waive the penalty-phase jury with her attorney or even whether she in fact wished to waive that right." *Id.* at 213. Because we found that the record colloquy was "insufficient to establish a knowing, intelligent and voluntary waiver of [O'Donnell's] right to a sentencing jury in the penalty phase of her trial," we vacated the sentence of death and remanded for a new penalty hearing. *Id.* at 214. In a footnote, the Majority also opined that it was "compelled to note that the record raises serious doubts concerning counsel's effectiveness during the penalty phase of [O'Donnell's] trial." Specifically, the Court was concerned that counsel's performance in preparing and presenting a case in mitigation at the penalty phase was deficient. *Id.* at 214 n. 13.[13]

This Justice filed a Dissenting Opinion, which was joined by Madame Justice Newman. The Dissent disagreed with the

13. We articulated our concern as follows:

Counsel's entire defense presentation during the penalty phase took only four pages to transcribe. He presented virtually no evidence of [O'Donnell's] upbringing or background; he did not present any independent mental health evaluations or institutional or other records; he did not call a single witness on [O'Donnell's] behalf. Instead, as evidence of mitigation, counsel merely relied on stipulations that [O'Donnell] had no history of prior criminal convictions, was the mother of six children, and was a drug user. He failed to present or argue any further evidence of mitigation even though the record itself indicates that other evidence of mitigation was available and known to counsel. Without dissecting all of the arguments presented by both parties, it is difficult to disagree with [O'Donnell] that a defense which amasses only four pages of transcript simply does not reflect adequate preparation or development of mitigating evidence by counsel representing a capital defendant in a penalty phase hearing. *See Commonwealth v. Perry*, 537 Pa. 385, 392, 644 A.2d 705, 709 (1994) ("it is not possible to provide a reasonable justification for appearing in front of a death penalty [sentencer] without thorough preparation").
*Id.*

Majority's apparent holding that a defect in the waiver colloquy *per se* requires vacatur of the sentence and a new penalty hearing. Citing to O'Donnell's counsel's statement on the record that he had made O'Donnell aware of her penalty phase jury trial rights, as well as the extensive guilt phase waiver colloquy, the Dissent opined that there was sufficient evidence of record to deem the waiver valid. Nevertheless, the Dissent ultimately reasoned that the better course would be to remand the matter for an evidentiary hearing "to determine whether trial counsel's assertions about informing appellant of her rights were sufficiently credible to support the conclusion that [O'Donnell] made a knowing, voluntary and intelligent waiver." *Id.* at 214 (Castille, J., dissenting). The Dissent emphasized that:

> The crux of the issue in question is whether [O'Donnell] knew and understood her rights so that a valid waiver of those rights could occur, not whether the court informed her of those rights. Whether a trial court informs a defendant of her rights on the record is simply one factor for consideration, not a litmus test.

*Id.* In support of the position that the validity of the record waiver should be assessed according to whether it was actually knowingly, voluntarily, and intelligently entered, rather than according to what was revealed in the record colloquy, the Dissent cited to authority from the U.S. Supreme Court and this Court recognizing that a consideration of the totality of the circumstances, and not just the record colloquy, should determine the question of knowing, voluntary and intelligent waiver—particularly when there was no contemporaneous challenge to the sufficiency of the colloquy. *See id.* at 216–219 (collecting cases).

*O'Donnell* is a significant, groundbreaking case, since it was the first case to consider the contours of penalty phase jury waivers and to establish the requirement of a record colloquy affirmatively indicating that the waiver was valid. The case is also significant because it set forth the procedural requirements for penalty phase jury waivers which would apply to all future such waivers.

The Commonwealth is correct that the fact that O'Donnell prevailed upon her novel but waived claim on direct review, via procedural operation of the relaxed waiver doctrine, is not dispositive of the question of appellant's entitlement to collateral relief, arising from a claim of ineffective assistance of counsel in failing to challenge the jury waiver at the trial court level and/or upon direct appeal. Claims of ineffective assistance of trial counsel are often derivative of record-based events at trial as to which no timely objection was raised; thus, they are matters which could have been the subject of contemporaneous objection and direct appellate review, but were defaulted. The claim *sub judice* is just such a claim. The foregone, underlying claim of error here (that the record jury waiver was inadequate), however, is distinct from the derivative and collateral claim that counsel was ineffective in failing to object. While the underlying claim is certainly relevant and important to assessing the claim of counsel ineffectiveness, it is relevant only insofar as it bears upon the *Strickland/Pierce* test for assessing counsel's performance. *See Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2586–87, 91 L.Ed.2d 305 (1986) (constitutional ineffectiveness standard under *Strickland v. Washington* "differs significantly from the elements of proof applicable to" Fourth Amendment claims; thus, while a meritorious Fourth Amendment issue is essential to a Sixth Amendment claim of ineffectiveness arising from failure to pursue a Fourth Amendment issue, a meritorious Fourth Amendment claim alone does not prove ineffectiveness; *Strickland* "gross incompetence" test must be met to prevail on Sixth Amendment claim); *Commonwealth v. Green,* 551 Pa. 88, 709 A.2d 382, 383 n. 4 (1998) (analysis of abandoned claim is undertaken solely for purpose of resolving questions of ineffective representation) (citation omitted), *Senk v. Zimmerman,* 886 F.2d 611, 614 (3d Cir. 1989), *cert. denied,* 493 U.S. 1035, 110 S.Ct. 756, 107 L.Ed.2d 772 (1990) (ineffectiveness claims are concerned with defense attorney's performance; underlying issue is only "indirectly implicate[d]").

Moreover, as a general and practical matter, the fact that a claim is litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error, makes it more difficult for the defendant to prevail. For example, an apparently meritorious but defaulted claim may fail to secure collateral relief if counsel had an objectively reasonable basis for failing to pursue the claim. In addition, assuming a claim of merit, the burden and standard of proof applicable in assessing prejudice differs. This Court addressed the difference in *Commonwealth v. Howard*, 538 Pa. 86, 645 A.2d 1300, 1307 (1994):

> [A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it "could have reasonably had an adverse effect on the outcome of the proceedings." *Pierce*, 515 Pa. at 162, 527 A.2d at 977. This standard is different from the harmless error analysis that is typically applied when determining whether the trial court erred in taking or failing to take certain action. The harmless error standard, as set forth by this Court in *Commonwealth v. Story*, 476 Pa. [391,] 409, 383 A.2d [155,] 164 [ (Pa.1978) ] (citations omitted), states that "[w]henever there is a *'reasonable* possibility' that an error 'might have contributed to the conviction,' the error is not harmless." This standard, which places the burden on the Commonwealth to show that the error did not contribute to the verdict beyond a reasonable doubt, is a lesser standard than the *Pierce* prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel. In a collateral attack, we first presume that counsel is effective, and that not every error by counsel can or will result in a constitutional violation of a defendant's Sixth Amendment right to counsel. *Pierce, supra.*

*Accord Commonwealth v. Williams,* 566 Pa. 553, 782 A.2d 517, 524–25 (2001) (*Strickland* "firmly establishes that one seeking relief from a conviction or sentence based upon a claim of ineffective assistance of counsel bears the burden of establishing prejudice ... whereas, trial errors which have been adequately preserved and thus need not be presented through a claim of ineffective assistance would generally implicate a burden on the part of the government to establish that the errors were harmless.").

In light of the distinct review standards applicable to a preserved claim of trial error versus a claim sounding in ineffective assistance, the PCRA court plainly erred in deeming the award of direct review relief to O'Donnell as being dispositive of the question of appellant's entitlement to relief on his collateral ineffectiveness claim. On the other hand, we are satisfied that the *O'Donnell* Court's evaluation of the unitary jury waiver colloquy in this case establishes the arguable merit prong of the counsel ineffectiveness claim presently raised by appellant. This is so, however, for more complicated reasons than were deemed sufficient to support this Court's grant of relief in *O'Donnell.*

Although the *O'Donnell* Court divided on the matter, a solid 4–2 majority determined that relief was warranted in that case, not because O'Donnell's jury waiver in fact was not knowing, voluntary, and intelligent, but because the record colloquy did not affirmatively demonstrate its knowing, voluntary and intelligent nature. The four corners of that same colloquy likewise do not definitively reveal that appellant's waiver of his right to a penalty phase jury was knowing, voluntary, and intelligent. The analysis here must necessarily depart from the analysis in *O'Donnell,* however, because appellant's trial counsel, who is presumed effective, cannot be deemed incompetent for having failed to claim that a defect in the record colloquy necessarily rendered the waiver invalid. Until *O'Donnell* was decided, nothing in Pennsylvania law held that such a defect **alone** would automatically warrant a new penalty hearing. At a minimum, as is indicated by the cases collected in the dissenting opinion in *O'Donnell,* there was

reason to believe that the question of the validity of the waiver would be assessed in real terms, *i.e.*, according to the totality of the circumstances indicating whether the waiver in fact was valid. *See O'Donnell,* 740 A.2d at 216–19 (Castille, J., dissenting) (collecting cases). It is settled that counsel cannot be deemed ineffective for failing to predict changes and/or developments in the law. *See Commonwealth v. Todaro,* 549 Pa. 545, 701 A.2d 1343, 1346 (1997) ("counsel's stewardship must be judged under the existing law at the time of trial and counsel cannot be deemed ineffective for failing to predict future developments or changes in the law").

Although counsel cannot be faulted for failing to predict that the law would require that the four corners of the colloquy must demonstrate the validity of the waiver, he certainly could be faulted if he failed to ensure that the waiver was **in fact** knowing, voluntary and intelligent. The classic definition of a valid waiver is "the intentional relinquishment of a known right," *see Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), and this Court has applied that standard to waivers of rights of non-constitutional dimension. *See Commonwealth v. Johnson,* 489 Pa. 129, 413 A.2d 1047, 1049–50 (1980) (waiver of post-verdict motions). We have no doubt that, even before the decision in *O'Donnell* was issued, counsel was obliged, at a minimum, to apprise his client of the nature and importance of the jury trial right at issue; the manner in which a penalty phase jury operates, including the role of mitigating and aggravating circumstances and the requirement of jury unanimity; and the relative advantages and disadvantages in choosing a jury trial versus a bench trial, both as a general matter and in light of the circumstances of the particular case.

In the case *sub judice,* trial counsel stated on the record that he had explained to appellant what his rights were, but he provided little detail concerning what that explanation had entailed.[14] Moreover, appellant did not confirm his understand-

14. After the prosecutor asked the trial judge to "briefly colloquy the defendants as to their agreement to waive a jury trial for the purposes of this penalty hearing," and the court engaged in a brief description of

ing of his rights on the record; instead, his lawyer spoke for him. On such a record, we cannot assess whether appellant's waiver was in fact knowing, voluntary and intelligent—except to the extent we are guided by the presumption that counsel was both competent and speaking truthfully. But, on this collateral attack, counsel's competence is the very question at issue. Resolution of the question depends in large part upon the substance of the private communications between appellant and trial counsel. Since the trial court disposed of this ineffectiveness claim without holding an evidentiary hearing— albeit it did so in appellant's favor—neither appellant nor his trial counsel were heard from on the issue.[15] It may be that counsel made clear to appellant in private the very points that this Court determined essential to a valid jury waiver colloquy in *O'Donnell,* in which case the ineffectiveness claim should fail. It may be that there was some overriding strategic reason as to why counsel and appellant determined that appellant's penalty phase prospects were best determined before a judge rather than a jury. On the other hand, it may be that appellant ceded this important right without having been apprised by his attorney of its importance, its nature and contours, and its strategic advantages—including the fact that to secure a successful result before a jury at the penalty phase, appellant needed only to convince one of twelve jurors that any mitigating circumstance(s) that the juror might find outweighed the single aggravating circumstance which was alleged and proven.

what the waiver entailed, appellant's counsel stated the following on the record:

I have explained to [appellant], your honor, what his rights are, that he would be entitled to a jury trial.

Also that [the jury] would be entitled to consider the evidence, and [they] would make the final decision.

[Appellant] agrees that he will waive a jury and have your honor decide his fate.

N.T., 6/30/93, at 545–546.

15. While the PCRA court opinion refers to PCRA "hearings," the only relevant transcript contains argument from counsel and no evidence from witnesses. *See* N.T., 1/17/01.

In this circumstance, the appropriate course is to remand to the PCRA court for an evidentiary hearing to determine whether, in fact, trial counsel was ineffective in encouraging or permitting appellant to enter a penalty phase jury waiver which was not knowing, voluntary, and intelligent.[16] Thus, although we agree with the Commonwealth that the outright grant of relief here was erroneous, the greatest relief available to the Commonwealth is a vacatur of the order granting a new penalty hearing and a remand for an evidentiary hearing.

This does not end our discussion, however, because appellant raises the additional claim that counsel was ineffective in failing to perform a reasonable investigation and thereby failing to locate and call available family members who had additional evidence material to mitigating circumstances. If this claim is resolvable on the merits now in appellant's favor, there would be no need to vacate the order granting a new penalty hearing. Appellant argues that his mother, his father, and his brother were available and willing to testify to appellant's good character; his family history of alcohol abuse; his parents' divorce; his history of abusing alcohol, marijuana, and heroin; O'Donnell's "terrible influence" on him; and his extreme mental or emotional disturbance. The affidavit of each putative witness accompanies appellant's brief. Appellant argues that, at a minimum, a reasonable investigation by trial counsel should have encompassed an attempt to interview his parents and family in an attempt to discover and develop additional evidence in mitigation.

The Commonwealth counters that appellant's penalty phase counsel in fact argued two stipulated mitigating circumstances to the judge—appellant's heroin addiction and appellant's lack

16. Our resolution in this regard is consistent with this Court's precedent recognizing that, when a collateral attack is leveled upon a record waiver, it is the totality of the circumstances, and not the record waiver or colloquy alone, which controls. See O'Donnell, 740 A.2d at 216–19 (Castille, J., dissenting) (collecting cases). Although O'Donnell set forth a different rule in the direct review paradigm, where the sufficiency of the colloquy was challenged (or deemed challenged) below, nothing in the decision called into question the applicability of this Court's precedent governing cases, like this one, where a collateral attack is at issue.

of significant prior criminal history—and that appellant himself took the stand during the penalty phase, expressing remorse, and testifying that he had a long history of substance abuse and was under the influence of drugs when he committed the killing. The Commonwealth further argues that appellant has not alleged or offered to prove that counsel was aware of the prospect that appellant's family could serve as a source of such mitigation evidence; and that, in any event, the affidavits represent evidence that is cumulative, at best, of the mitigation evidence that counsel actually presented. The PCRA court granted no hearing on this claim, just as it granted no hearing on the claim upon which it awarded relief. In its opinion, the court rejected this claim on the basis of a finding that, in light of the brutal manner of the killing, dismemberment, and disposal of the victim's body in this case, appellant was not prejudiced by the absence of the proposed testimony. PCRA Court Slip Op. at 3.[17]

It is well-established that "[c]ounsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary." *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 735 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)). The U.S. Supreme Court has also recognized the obligation of capital defense counsel "to conduct a thorough investigation of the defendant's background," particularly with respect to the preparation and presentation of mitigation evidence at a capital defendant's sentencing hearing. *See Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000). Indeed, the essence of the defense function at the penalty phase of a capital trial consists of marshaling and presenting evidence in

17. The PCRA court also noted that, had appellant's family members testified to his truthfulness, appellant's two prior *crimen falsi* convictions would have been admissible against him at the penalty phase. The parties do not mention, and the record does not reveal, the existence or nature of appellant's prior *crimen falsi* convictions. Even assuming the existence of such *crimen falsi* convictions, since the proffered witnesses would have testified to matters other than truthfulness, the existence of the convictions would not have operated to prevent their circumscribed testimony.

mitigation, rebutting evidence in aggravation, and zealously advocating why, under the specific circumstances, life in prison is the appropriate verdict.

■■■■■ This Court has recognized that the reasonableness of counsel's investigative decisions can depend critically upon information that his client relates to him. *See Commonwealth v. Williams*, 577 Pa. 473, 846 A.2d 105, 113 (2004); *Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 45 (2002) (citing *Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334, 340–41 (1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999)); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373, 383 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). "Thus, assuming a reasonable investigation, where there is no notice to counsel of particular mitigating evidence, he cannot be held ineffective of failing to pursue it." *Basemore*, 744 A.2d at 735 (citing *Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 238 (1998)). However, it is also settled that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 528, 123 S.Ct. 2527, 2539, 156 L.Ed.2d 471 (2003) (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066 (1984)).

The family member witnesses whom counsel is faulted for failing to have interviewed and presented at the penalty phase are the sort of witnesses whose existence should have been readily apparent or discoverable to any counsel who conducted a reasonable investigation. Nevertheless, it is apparent from the existing state of this record that appellant is not entitled to immediate relief upon this claim. The witnesses have not been heard from in court, and thus their credibility has not been assessed. Nor has trial counsel been heard from, so that the actual nature of his investigation, its reasonableness, and the reasonableness of his decision as to what evidence in mitigation to present at the penalty phase have not been assessed.

We are aware of the Commonwealth's objections concerning the technical deficiencies in appellant's pleading of this claim. However, those deficiencies are, at least theoretically, matters which may be cured by amendment. In this regard, it is notable that the pleading deficiencies were not the basis for the PCRA court's summary dismissal of this particular claim, and thus, appellant was afforded no chance to attempt to amend and cure. *See* Pa.R.Crim.P. 909(B)(2); *Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 658 (2003); *Williams*, 782 A.2d at 526. Moreover, the PCRA court's stated basis for dismissing this claim was rather generic and unconvincing. The fact that this was a brutal slaying does not ineluctably negate the force of unpursued evidence concerning the particular background and circumstances of appellant which might suggest that he is not generally of such character—*i.e.*, that this deed was an aberration and not typical. In short, we are not as certain as the PCRA court that this additional evidence in mitigation, should it prove to be relevant, could not have changed the outcome as a matter of law.[18]

Because we have already determined that the case should be remanded for a hearing on the claim upon which the PCRA court awarded relief, we believe the better course is to remand this claim as well. In so determining, we offer no view upon the ultimate merit of the claim; rather, our analysis has been confined to whether either party could be said to be entitled to prevail upon the claim as a matter of law upon the current state of the record, and we have held that no such ruling would be appropriate. Moreover, we note that, depending upon the outcome of the inquiry into the claim concerning the validity of appellant's penalty phase jury waiver, it may not be necessary for the PCRA court to further address this claim at all. On the other hand, if the PCRA court determines that the jury waiver claim fails, it should allow for further development of this alternative claim concerning counsel's failure to produce additional evidence of mitigation.

18. In this regard, we note that the PCRA judge was not the trial judge in this matter.

For the foregoing reasons, we vacate the PCRA order below and remand to the PCRA court for an evidentiary hearing consistent with this opinion. Jurisdiction is relinquished.

Justice SAYLOR files a concurring opinion.

Justice NIGRO concurs in the result.

Justice SAYLOR, concurring.

I differ with the majority's holding that Appellant's claim of ineffective assistance of counsel for withdrawing a severance motion is previously litigated on the basis that Appellant pursued a *Bruton* challenge to the Commonwealth's use his co-defendant's statement at the joint trial. *See* Majority Opinion, *op.* at 461–62. Although one aspect of the disposition of Appellant's present claim certainly involves consideration of the Court's holding on direct appeal, the majority's alternative merits analysis demonstrates that the claim implicates a broader inquiry into the character of the defenses at issue. *See id.* at 462–63. As such, I would treat it as materially distinct. Furthermore, although for the most part I agree with the majority's merits assessment, I would abandon the rhetoric from prior cases to the effect that antagonistic defenses actually favor a joint trial. *See* Majority Opinion, *op.* at 462 (citing *Commonwealth v. Chester*, 526 Pa. 578, 590, 587 A.2d 1367, 1373 (1991)). Instead, I find it preferable to say that antagonistic defenses do not *per se* require severance; rather, it should be required only where there is a substantial risk of impingement on the defendants' trial rights and/or the fact finder's ability to render a reliable verdict. *Accord Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993).

I also disagree with the majority's approach of discounting Appellant's efforts to advance legal propositions reflected in *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166 (1999) (opinion on reargument), and *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality), on the basis that counsel cannot be deemed ineffective for failing to antici-pate those decisions. *See* Majority Opinion, *op.* at 462. Ap-

pellant cites these decisions primarily for the fairly well settled propositions that, for Confrontation Clause purposes, particularized guarantees of trustworthiness associated with a hearsay statement are assessed on the basis of the statement itself and the circumstances under which it was made and not on the basis of corroborative evidence produced by the government at trial, *see Idaho v. Wright*, 497 U.S. 805, 822–23, 110 S.Ct. 3139, 3150–51, 111 L.Ed.2d 638(1990), and co-defendant confessions to authorities are presumptively unreliable to the extent that they tend to shift or spread blame. *See Lee v. Illinois*, 476 U.S. 530, 545–46, 106 S.Ct. 2056, 2064–65, 90 L.Ed.2d 514 (1986). In the latter respect in particular, I believe that the majority's statement that, at the time of Appellant's trial Sixth Amendment jurisprudence did not foreclose the possibility that a recognized hearsay exception could permit the admission into evidence of an unavailable co-defendant's out-of-court statement, offered against and inculpating the defendant, *see* Majority Opinion, *op.* at 464–65, should be substantially qualified. *Accord Lee*, 476 U.S. at 545, 106 S.Ct. at 2064 ("As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.").

Finally, as to Appellant's claim of ineffective assistance of counsel in the failure to challenge the penalty-phase waiver colloquy, it should not go unnoticed that relief would be available to Appellant at this juncture, as it was to his co-defendant, if the prevailing law that was in effect at the time that he filed his post-conviction petition (*i.e.*, relaxed waiver) were to be applied. Although I acknowledge that I am bound by the Court's adherence to the decision to abolish relaxed waiver retroactively, I continue to believe that we should reflect on the wisdom of that decision as we continue to encounter disparities arising by virtue of the application of enhanced requirements on a retrospective basis. *Accord Com-*

686

*monwealth v. Ford,* 570 Pa. 378, 397–400, 809 A.2d 325, 337–38 (2002) (Saylor, J., concurring).