J-S53024-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GERALD WRIGHT | |
| Appellant | No. 2574 EDA 2018 |

Appeal from the Judgment of Sentence Entered August 3, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0004499-2017

BEFORE:  OLSON, J., STABILE, J., and NICHOLS, J.

MEMORANDUM BY STABILE, J.:　　　　　　**FILED DECEMBER 09, 2019**

Appellant, Gerald Wright, appeals from his judgment of sentence of imprisonment for attempted murder, 18 Pa.C.S.A. § 901, and related offenses. Appellant argues that the trial court erred by permitting evidence of his post-arrest silence in response to a police detective's question.  We affirm.

The trial court recounted the evidence adduced during Appellant's bench trial as follows:

> On April 20, 2017, at approximately 11:00 PM, Tyrrell Faison, Omar [no last name] and [Appellant] decided to get Chinese food. [Appellant rode as a passenger] in a Kia minivan while Faison and Omar followed in a white Lexus.  At around 15th Street and Nedro Avenue, the Kia minivan that [Appellant] was a passenger in stopped, and Faison stopped his car as well.  Faison saw [Appellant] exit the van and walk up toward Conlyn Street.  A few minutes later, he heard 6-7 gunshots.  Once Faison heard the gunshots, he ducked and when he looked outside again, he saw the Kia pull off.  Faison drove off immediately as well.

During this time period, Tyrell Barnes was headed to the KFC near 15th and Conlyn Streets until he stopped to chat with his friend, uncle, and a few other people, on Conlyn Street, about a block away from the KFC. After chatting for a bit, Barnes sat in the front passenger seat of his friend's car to smoke some marijuana with his friend, Eugene. Shortly after entering the vehicle, Barnes heard shooting, at least five shots. He and Eugene exited the vehicle and Barnes ran up Conlyn Street, away from 15th Street. Barnes had run about 25 steps when he hit the ground and noticed he had been shot.

After Barnes was shot, his uncle helped him and he was taken to Einstein Hospital. Barnes remained in the hospital for four days and had one surgery where the left side of his body, underneath his armpit, was stapled. Barnes was shot five times: once in his left arm, once under his lung, once right behind his heart, and twice in his back. Barnes needed the assistance of a walker for about three weeks after he was discharged from the hospital, and two bullets remained in his body, one behind his heart and the other on the right side of his back.

Around the same time that the shooting occurred, Police Officer Chad Gugger and Police Officer Reuben Henry responded to a radio call reporting gunshots in the area of 15th Street and Conlyn Street. As the officers approached Conlyn Street, they observed a black Kia Sedona and a white Lexus driving the wrong way on the 1700 block of Conlyn Street, a one-way street, at a high rate of speed. The two vehicles continued at a high rate of speed, arrived abruptly at a stop sign, passed through the intersection over Conlyn Street, and made a left to go around a U-shaped street on Grange. Officer Gugger lost sight of the vehicles for approximate 3-5 seconds, and when he regained sight of them, both were stopped in the middle of Grange Street, near a red-roofed building. Once he caught back up to the two vehicles, they proceeded to drive off again. The officers continued following the two vehicles north on Ogontz Avenue until the Kia Sedona made a left on Nedro Avenue. The officers followed the Kia and Officer Henry put out flash information on the Lexus.

Upon following the Kia, Officer Gugger activated his lights and sirens. The Kia continued to speed away with police following until it eventually crashed into a home located at 2152 Nedro Avenue. After the Kia crashed, Officer Gugger saw [Appellant] flee from the rear driver's side of the vehicle, and he proceeded to give

chase. While fleeing, [Appellant] saw two other officers approaching westbound on Nedro Avenue, [and] he then went toward the sidewalk, put his hands in the air, and got down on the ground. Officer Gugger successfully handcuffed [Appellant] and walked him back to the police car. Subsequently, Officer Gugger returned to the Kia to see if there was anyone else inside. He noticed the back door of the Kia was still open and he looked on the rear driver's side, and on either the floor or the seat area, he observed a spent fired cartridge casing ("FCC").

After detaining [Appellant], officers completed a 75-229 form which gave, among other things, a description of the person arrested and description of clothing at the time of arrest. The 75-229 form for [Appellant] stated that [Appellant] was arrested wearing a black hooded sweatshirt, black pants, and tan boots.

Once [Appellant] and [the Kia's] driver were taken into custody, Officer Henry returned to Grange Street at the area that he had observed the Lexus and Kia briefly stop. When he searched the area with his flashlight, he observed a 9mm Glock handgun with an extended clip located half on the sidewalk and half on the grass.

Detective Patrick Murray processed both the crime scene at 15th and Conlyn Streets and the crime scene at Grange Street, where he took photographs, created a rough sketch, and recovered ballistic evidence. While investigating the first crime scene at 15th and Conlyn Streets, Detective Murray recovered a total of thirteen 9mm FCCs and eleven .45 caliber FCCs which he then placed on Property Receipt 3273798. Detective Murray then proceeded to the secondary crime scene at Grange Street where he recovered two firearms—one empty 9mm Glock with a 30-round extended magazine and one .45 caliber semi-automatic handgun with an empty 12-round magazine—that he placed on Property Receipt 3273788.

After his arrest, [Appellant] had been transported to the Northwest Detective Division. At around 2:00 AM, Detective Timothy Hartman was tasked with recovering the outer garments of the suspects, including [Appellant]. Detective Hartman recovered three of the four suspects' outer garments without incident, but when he went to collect [Appellant]'s hooded sweatshirt (noted in the 75-229) from [Appellant] located in Cell 18, he noticed [Appellant] was no longer wearing it. Detective

Hartman asked [Appellant] for the location of the sweatshirt, to which he was met with silence. Detective Hartman looked around and observed a hooded sweatshirt on the bench of Cell 17, the cell directly next to Cell 18. Cell 17 was unoccupied at the time he was tasked with retrieving the outer garments. Based on the setup of the cells, one would be able to reach outside of the front cell bar of one cell and throw something into the next cell.

Detective Hartman proceeded to have a conversation with the individual who had been inhabiting Cell 17 earlier in the evening. Based on this conversation, Detective Hartman returned to Cell 17 to recover the hooded sweatshirt contained in it. He then asked Officer Gugger and Officer Henry for verification that the sweatshirt appeared to be the same as the one [Appellant] had been wearing when he was arrested. Once this was confirmed, the sweatshirt was placed on Property Receipt 3273790.

Sometime after the recovery of the sweatshirts from the suspects, the trace laboratory released a report detailing that the sweatshirt taken from the cell next to the one [Appellant] was in, and attributed to [Appellant], had tested positive for the presence of primer gunshot residue particles.

Upon reaching its verdict, the trial court considered the fact that Faison saw [Appellant] leave the Kia, walk around the corner, heard gunshots, and then saw [Appellant] return to the car; after the Kia crashed, Officer Gugger observed [Appellant] exit the rear driver side of the Kia; the rear driver side of the Kia was where the 9mm FCC was found; the 9mm FCC recovered from the Kia was deemed to be from one of the firearms, later designated pistol 1, discovered on Grange Street; the 229 form described [Appellant] as wearing a black hooded sweatshirt, the same description as the one found in Cell 17 by Detective Hartman; that same sweatshirt was later identified by Officer Gugger and Officer [Henry]; and testing determined that there was the presence of gunshot residue on the hooded sweatshirt recovered from Cell 17.

Trial Court Opinion, 1/22/19, at 2-6.

The trial court found Appellant guilty of attempted murder, aggravated assault, conspiracy to commit murder, possessing a firearm without a license, possessing a firearm on a public street and possessing an instrument of crime.

On August 3, 2018, the court sentenced Appellant to eight to sixteen years' imprisonment for attempted murder, followed by concurrent terms of probation of four years for each firearms violation and two years for possessing an instrument of crime. Appellant's aggravated assault and criminal conspiracy convictions merged with attempted murder for sentencing purposes. Appellant filed timely post-sentence motions, which the court denied, and a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises two issues in this appeal:

1. Did the trial court err by admitting evidence that, after his arrest and while in police custody, Appellant remained silent in the face of questioning by law enforcement?

2. Did the trial court improperly admit evidence of a conversation between an investigating detective and a prisoner in a cell adjacent to Appellant's, which produced inculpatory evidence against Appellant?

Appellant's Brief at 5.

Both of Appellant's arguments on appeal relate to the following testimony during trial:

**DETECTIVE HARTMAN**: And I went to recover the outer most garments for the defendant Gerald Wright, sitting in the middle of the three defendants. Gerald Wright was in 18 Cell, Your Honor, in our cell room, which is the very last cell on the backside of the cell room. When I went to get his hood sweatshirt or the outer most garment -- when I got there, he was in a plain white t-shirt. I asked him where his sweatshirt was and he refused to answer me.

**DEFENSE COUNSEL**: Objection.

**THE COURT**: Overruled.

**DETECTIVE HARTMAN**: I inquired where his sweatshirt was, and I didn't get an answer, Your Honor. The cell next to him was 17 Cell. That cell was open and it was unoccupied at the time that I went down there. There was a hooded sweatshirt sitting on the bench of 17 Cell. I went and found that the person that was occupying 17 Cell was being photographed and fingerprinted at the time. Based on the conversation I had with that gentleman –

**DEFENSE COUNSEL**: Objection; move to strike.

**THE COURT**: Without telling us what the conversation was, what did you do next?

**DETECTIVE HARTMAN**: I wasn't going to tell you, Your Honor. Based on the conversation I had with that gentleman, I went and recovered the sweatshirt that was in 17 Cell on the bench. I showed that sweatshirt to Police Officer Gugger and Police Officer Henry. And that sweatshirt was placed on Property Receipt 3273790.

N.T., 4/26/18, at 142-43.

Arguably, Appellant waived both of his arguments on appeal because trial counsel failed to specify the grounds for his objections to Detective Hartman's testimony. *Commonwealth v. Thomas*, 194 A.3d 159, 166 (Pa. Super. 2018) ("[i]n order to preserve an evidentiary objection for purposes of appellate review, a party must interpose a timely and specific objection in the trial court"). We will excuse this defect, because the trial court's opinion demonstrates that it understood the nature of counsel's objections despite their vagueness.

Both of Appellant's arguments concern the admissibility of evidence introduced during trial. Evidentiary rulings are within "the sound discretion of

the trial court and its discretion will not be reversed absent a clear abuse of discretion." *Commonwealth v. Thompson*, 106 A.3d 742, 754 (Pa. Super. 2014).

First, Appellant complains that Detective Hartman's testimony, "I asked [Appellant] where his sweatshirt was and he refused to answer me," was an impermissible reference to Appellant's post-arrest silence because of the detective's failure to administer *Miranda*[1] warnings. No relief is due.

Detective Hartman testified to the court, sitting as fact-finder, that he recovered the outer garments of Faison and two other suspects that were in custody for the shooting. The detective then proceeded to Appellant's cell and discovered that Appellant was not wearing the sweatshirt that, according to the 75-229 form, he had been wearing at the time of his arrest. Nor was the sweatshirt in Appellant's cell. The detective asked Appellant where his sweatshirt was, and Appellant "refused to answer." N.T., 4/26/18, at 142. The detective located the sweatshirt in an adjoining cell that could be reached through the bars of Appellant's cell. The sweatshirt tested positive for gun residue.

The "mere revelation of [a criminal defendant's] post-arrest silence does not establish innate prejudice." *Commonwealth v. Spotz*, 870 A.2d 822, 833 (Pa. 2005). "Even an explicit reference to silence is not reversible error

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt." *Id.*

Appellant argues that the trial court committed reversible error by construing his silence as a tacit admission of guilt. Under the circumstances of this case, it is possible to construe Appellant's silence as inculpatory. Conceivably, he remained silent because he knew he had just abandoned evidence of a crime (gunshot residue on his sweatshirt). Nevertheless, even if Appellant's silence was an admission of guilt, the law presumes that when the trial court sits as factfinder, it disregards any inadmissible evidence in its consideration of the case. *Commonwealth v. Gribble*, 863 A.2d 455, 462 (Pa. 2004); *Commonwealth v. Dent*, 837 A.2d 571, 582 (Pa. Super. 2003) (in non-jury trial, judge presumed to have disregarded inadmissible hearsay testimony). The burden falls upon Appellant to overcome this presumption, but he fails to do so, because the trial court made clear in its opinion that it based its verdict on evidence unrelated to Appellant's silence. The court wrote that it found the following evidence dispositive: Appellant's acquaintance, Faison, who was driving behind the Kia in which Appellant was riding, saw Appellant exit the Kia and walk up Conlyn Street. Opinion at 5. Faison then heard gunshots and observed the Kia pull away. *Id.* Police officers testified that the Kia sped down a one-way street the wrong way and continued to evade the officers until it crashed into the side of a house. *Id.* Appellant alighted from the Kia and fled on foot. *Id.* Near the Kia, police found an

operable handgun that had just been fired. *Id.* They also found matching projectiles and fired cartridge casings in the Kia and at the crime scene. *Id.* Following his arrest, Detective Hartman found Appellant's sweatshirt in an adjoining cell. *Id.* The crime lab found powder from a discharged firearm on the sleeve of the sweatshirt. *Id.* at 6. Since this evidence established Appellant's guilt independent of his silence, Appellant's argument fails.

In his second argument, Appellant claims that the court erred by admitting hearsay evidence of a conversation between Detective Hartman and the individual who occupied the cell adjacent to Appellant. We disagree.

To begin, the Commonwealth did not introduce the substance of the conversation. Detective Hartman merely stated that he had a conversation with the individual who occupied the cell next to Appellant and described the steps he took after the conversation. Even if the detective had testified about the contents of the conversation, his testimony would not have been hearsay. "It is well established that certain out-of-court statements offered to explain the course of police conduct are admissible because they are offered not for the truth of the matters asserted but rather to show the information upon which police acted." *Commonwealth v. Trinidad,* 96 A.3d 1031, 1037 (Pa. Super. 2014). Had the content of the conversation in question been introduced, it would have been admissible to show the detective's course of conduct. Further, had any content of the conversation constituted

inadmissible hearsay, the trial court, sitting without a jury, presumably would have disregarded it in reaching its verdict. ***Dent***, 837 A.2d at 582.

For these reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/9/19