J-A18031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
:
v.                                 :
:
:
:
BENJAMIN MELVIN DAVIS            :
:
Appellant           :   No. 539 WDA 2020

Appeal from the Judgment of Sentence Entered September 5, 2019
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0001334-2018

BEFORE: OLSON, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:         **FILED: NOVEMBER 16, 2021**

Benjamin Melvin Davis ("Davis") appeals from the judgment of sentence

imposed following his conviction of rape of an unconscious victim and criminal

conspiracy.[1] We affirm.

The trial court summarized the relevant facts underlying this appeal as

follows:

> [The victim] testified that in January of 2018, she was living
> at the Autumn Brook Apartments in Greensburg with her son.
> [The victim] indicated that on January 17, 2018, she had plans to
> hang out with [Kelly] Shields [("Shields")], who[m] she had been
> friends with since high school. After picking her up, Shields
> informed [the victim] that Levi Evans [("Evans")] was coming with
> her, and she asked if his friend, Davis[,] could also come with him.
> [The victim] testified that she picked Shields up at around 9:30[
> or] 10:00 [p.m.,] and then they proceeded to pick up Evans and
> Davis at the Sunoco gas station by Schaller's Bakery. They then
> all went to Sheetz on [Route] 819 in Greensburg and then went

---

[1] 18 Pa.C.S.A. §§ 3121(a)(3), 903.

back to [the victim's] apartment to eat and smoke marijuana. [The victim] stated that she started to get tired and fell asleep on her bed in Shields'[s] arms wearing a T-shirt and boxers. Subsequently, [the victim] testified that she was woken up to someone penetrating her vagina on her bed and a shadow behind her. [The victim] indicated that this figure had dreadlocks[,] so she believed it was Evans. [The victim] stated that she was not fully conscious, and she could not move or scream at that time. Additionally, [the victim] testified that she was unable to move her hands, roll over, or verbalize anything. [The victim] indicated that she was conscious for "maybe 30 seconds to a minute" and then she fell back asleep before being awoken again and[, this time,] observing Davis behind her.

Once again, [the victim] testified that she was unable to move or speak, and after being conscious for another thirty seconds to a minute, she fell asleep again. [The victim] stated that she awoke in the morning in the living room[,] where she was laying naked on a futon with Davis behind her. [The victim] testified that she felt "really confused" and located Shields in the bedroom and tried to ascertain what happened. [The victim] indicated that Shields found four used condoms in the bedroom. [The victim] testified that she and Shields then drove Evans and Davis back to the Sunoco. After dropping Evans and Davis off, [the victim] indicated that she and Shields sat in the hospital parking lot for an hour-and-a-half while Evans and Davis called her phone asking her not to press charges. According to [the victim], Shields spoke to Davis in her presence and informed him that [the victim] was debating telling the police[,] to which Davis allegedly responded[,] "Shields said it was okay," implying there was sexual consent. [The victim] also testified that Evans called her and said that Davis "told him it was okay." [The victim] indicated that she drove home and discussed this matter with her parents and her friends before calling the police and reporting the incident.

[The victim] stated that she was familiar with Davis, who[m] she referred to as "Spen Ben," and she indicated that she saw him on two prior occasions—approximately the week before and earlier in the day before the incident. [The victim] confirmed that she met Evans at approximately the same time, meeting Evans two or three days prior to meeting Davis.

Text message exchanges between [the victim] and Davis were admitted as Commonwealth's Exhibit One. [The victim] testified that Davis previously asked her about having a sexual relationship with him, and she had turned him down, saying she "ain't looking for dick." Specifically, a message from [the victim] two days prior to the incident stated, "I'm just bluntly putting it out there for all cuz I'm tired of people thinking I need dicked down." After the incident, another message from [the victim] to Davis indicated, "Since y'all want to treat me like a hoe when I told you I don't want dicked down, don't ever hit me up."

Shields confirmed that she has known [the victim] for 11-and-a-half years[;] she knew Evans from school[;] and she has known Davis for eight or nine years. … After smoking marijuana and falling asleep, Shields testified that she was awoken to the sound of [the victim] saying "stop, get off me." Shields stated that at that time she could barely see anything and everything was blurry, but she observed Evans and Davis standing by [the victim]. When Shields woke up the second time, she indicated that Evans was standing behind her and tried to pull her pants down to have sex with her, but she told him no. Shields testified that only she and Evans were in the bedroom at that time. After waking up the next day, Shields indicated that she heard [the victim] crying in the shower, and [the victim] told her what had happened. After talking with [the victim], Shields testified that she told Evans and Davis to get their belongings and informed them that they were taking them home "because of what they did." After dropping them off and returning to [the victim's] apartment, Shields stated that Evans and Davis messaged her and [the victim]. Shields then testified that [the victim] called the police, and after giving their statements, they went to the hospital. Shields confirmed that she saw used condoms in [the victim's] room. Davis elected not to testify at trial.

During trial, the Commonwealth introduced screenshots of Facebook messages exchanged between Shields and Evans. Shields testified that she took screenshots of the messages between her and Evans, whose named appeared as "Tellemboutdat" and provided them to the police. One message from Shields read that "I'm at Sunoco," which Shields indicated meant she was with [the victim] waiting to pick up Evans. A message from the following day from Shields to Evans stated, "Oh God, I'm pissed off cus shes crying cus y'all played her that's weird as fuck truth." Evans then responded "how," to which Shields

replied, "Cus u ain't asked her to fuck her, you just did." Evans replied, "It looks like she cool wit it. U feel, fell asleep n left her now, datz that's weird as fuck truth. Additionally, the messages revealed that Evans wrote, "Tell her I said my fault didn't think she cared."

The parties made the following stipulations at trial: If called as a witness, Jeanne Casino, a Registered Nurse and Certified Sexual Assault Nurse Examiner, would testify that on January 18, 2018, she conducted a sexual assault examination on [the victim] and collected a blood sample from [the victim] and Shields on January 19, 2018. If called as a witness, Michele Barch, a Forensic Scientist at the Pennsylvania State Police Crime Lab and an expert in serology, would testify that she swabbed the two condoms recovered at [the victim's] apartment and the vaginal sample collected from [the victim] and prepared them for DNA analysis. If called as a witness, Rachael Rodriguez, a Forensic DNA Scientist with the Pennsylvania State Police Forensic DNA Division[,] and an expert in DNA identification and profiling[,] would testify that she conducted DNA analysis on the two condoms, and the DNA found on the condoms matched the DNA profile of [the victim] and Davis.

Trial Court Opinion, 8/12/20, at 2-6 (citations to record and some brackets omitted).

Davis was charged with rape of an unconscious victim, possession with intent to deliver marijuana, and criminal conspiracy to commit rape of an unconscious victim.[2] A jury found Davis guilty of rape of an unconscious victim, and criminal conspiracy to rape an unconscious victim. The jury acquitted Davis of possession with intent to deliver marijuana. The trial court

_____

[2] Though Davis references Evans as his co-defendant throughout his appellate brief, there is no indication in the record that they were tried together. In particular, there is no mention of Evans as a defendant throughout the trial transcript.

- 4 -

deferred sentencing for the preparation of a presentence investigation report and the completion of an evaluation by the Sexual Offender Assessment Board ("SOAB").[3] The trial court sentenced Davis to a term of 6 to 12 years in prison, with credit for time served, for his rape conviction, and a concurrent term of 5 to 10 years for his conspiracy conviction. Additionally, the trial court ordered Davis to pay restitution for lab fees, and directed him to have no further contact with the victim and Shields.

On September 27, 2019, Davis filed a Motion for leave to file a post-sentence motion, *nunc pro tunc*, citing counsel's error in failing to timely file such. The trial court granted Davis's Motion, and Davis promptly filed his Post-Sentence Motion, *nunc pro tunc*. The Post-Sentence Motion was ultimately denied by operation of law. Davis filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

On appeal, Davis raises the following issues for our review:

1. Whether there was insufficient evidence to support the conviction of [c]riminal [c]onspiracy[,] when the Commonwealth failed to prove that there was an agreement between [Davis] and his codefendant to commit a rape?

2. Whether a written statement by the co-defendant was improperly permitted to be used against [Davis] in violation of

_____

[3] The SOAB determined that Davis is not a sexually violent predator.

> ***Bruton v. United States***, 391 U.S. 123 (1968)[,[4]] and the Confrontation Clause of the United States Constitution, and the co-conspirator exception to the rules against hearsay when the statement was made after any conspiracy had concluded?

Brief for Appellant at 4 (footnote added).

In his first issue, Davis argues that there was insufficient evidence to support his conviction of criminal conspiracy to commit rape of an unconscious victim. ***Id.*** at 15. Davis claims that the Commonwealth failed to establish an agreement between him and Evans. ***Id.*** According to Davis, "it cannot be understated that the victim knew and considered [Davis] and [] Evans as friends." ***Id.*** at 17; ***see also id.*** at 18 (arguing that victim and Davis smoked marijuana on every occasion in which they had spent time together). Davis contends that "[he] only wanted to have sex with the victim and no facts show that Evans agreed to help [Davis] accomplish this goal." ***Id.*** at 19. Further, Davis asserts that "there was no common goal[,] and no inferences can be made to show an agreement was reached between them." ***Id.*** at 20.

We are cognizant of the following standard of review:

> When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth

---

[4] In ***Bruton***, the United States Supreme Court held that where a non-testifying co-defendant's confession directly and powerfully incriminates the defendant, an instruction to the jury to consider the evidence against only the co-defendant is insufficient to protect the defendant's Sixth Amendment confrontation rights. ***See Bruton***, 391 U.S. at 135-36.

need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to accord each witness's testimony and to believe all, part or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Steele*, 234 A.3d 840, 845 (Pa. Super. 2020) (citations, quotation marks, and brackets omitted). Additionally, "[a]ny doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Commonwealth v. Furness*, 153 A.3d 397, 401 (Pa. Super. 2016) (citation and brackets omitted).

The Crimes Code defines the offense of conspiracy, in pertinent part, as follows:

**§ 903. Criminal Conspiracy**

**(a) Definition of conspiracy.--**A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

* * *

**(e) Overt act.--** No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such

- 7 -

conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S.A. § 903. Additionally, a person is guilty of rape of an unconscious person "when the person engages in sexual intercourse with a complainant … [w]ho is unconscious or where the person knows that the complainant is unaware that the sexual intercourse is occurring." 18 Pa.C.S.A. § 3121(a)(3).

"Simplified, [conspiracy] requires proof of three elements: 1) an agreement, 2) shared criminal intent, and 3) an overt act." *Commonwealth v. Johnson*, 180 A.3d 474, 479 (Pa. Super. 2018). Further,

> the essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. …

*Id.* (citation and brackets omitted); *Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) (stating that "[a] conspiracy is almost always proved through circumstantial evidence."); *see also Commonwealth v. Murphy*, 844 A.2d 1228, 1238 (stating that intent may be established through "the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." (citation omitted)).

Regarding Davis's challenge to his conspiracy conviction,[5] the trial court stated as follows:

> [The victim] contends that after falling asleep on the date of the incident, she was awoken to Evans penetrating her vagina while she was laying on her bed in her bedroom. After falling asleep again, [the victim's] testimony reveals that she observed Davis behind her while she was laying on her bed in the same position. [The victim] stated that she was in a state of confusion the following morning when she awoke in her living room laying naked on a futon with Davis behind her.
>
> … Despite minor discrepancies, Shields'[s] testimony corroborated [the victim's] in that Shields'[s] testimony revealed that she observed both Evans and Davis standing by [the victim] in her bedroom. Shields also testified that she heard [the victim] say "stop, get off me." Messages between [the victim] and Davis prior to and after the incident established that [the victim] was not looking for a sexual relationship with Davis, and she made that known to Davis in advance. … Additionally, [the victim's] testimony revealed that Evans called her on the phone, and told her Davis "told him it was okay." … [U]pon a review of the conduct and surrounding circumstances, the [trial c]ourt finds that the Commonwealth presented sufficient evidence to infer that Evans and Davis conspired to rape [the victim] on the date of the incident.

Trial Court Opinion, 8/12/20, at 10-11.

Our review of the record reflects that the victim testified that she met and had been in contact with both Davis and Evans prior to the night of the rape. *See* N.T., 6/5-6/19, at 41-44. Additionally, the Commonwealth introduced messages between the victim and Davis, sent both before and after the rape. *See* N.T., 6/5-6/19, at 48 (wherein Commonwealth's Exhibit 1 was admitted into evidence at trial). The following exchange occurred between

---

[5] In its Opinion, the trial court addressed conspiracy and the underlying rape conviction together.

the Assistant District Attorney ("ADA") and the victim concerning these messages from the Tuesday prior to the rape:

[ADA]: On Tuesday of that week, the message … ["]Wassup with you today;["] is that from [] Davis?

[Victim]: Yes.

Q: And you responded ["]natta u["]?

A: Yes.

Q: And then he said he was trying to chill. Is that common for what you guys did, you just kind of hung out together?

A: Yes.

Q: And your response here – can you tell us what you said to him?

A: I can't see it. I told him I ain't looking for dick.

Q: Okay. And so what were you – what did you mean when you said that?

A: He had – prior had asked me about having a sexual relation [*sic*] with him, and I had turned him down.

Q: Okay. So as soon as he asked you if you wanted to chill, you told him that?

A: Yes.

….

Q: And then these messages, this is the third page of Exhibit 1, from you: ["]I'm just bluntly putting it out there for all cuz I'm tired of people thinking I need dicked down.["] That's Wednesday at 1:00 in the afternoon. This is you, again, telling him you're not interested in sex; is that right?

A: Yes.

Q: And he responded ["]I feel u. I was just tryna smoke yesterday["]?

*Id.* at 50-51.

The victim testified that on the morning after the rape, she and Shields dropped off Evans and Davis at the Sunoco. *Id.* at 65. The victim and Shields then drove to the hospital, and sat outside in the car, "for probably about an hour-and-a-half while [Davis] and [Evans] were calling my phone asking [the victim] to not press charges." *Id.* According to the victim, Davis also called Shields, who talked to Davis on speakerphone while the victim was next to Shields in the car. *Id.* at 66. At that time, Davis stated that Shields "said it was okay." *Id.* at 67, 69. Additionally, the victim testified that a similar speakerphone conversation took place with Evans, wherein Evans stated that "[Davis] had told him it was okay." *Id.* at 69.

The Commonwealth then asked the victim to read from another portion of Commonwealth's Exhibit 1, which included messages between her and Davis following the rape:

> [ADA]: And this is the last page of Exhibit 1. … This says Thursday at 1:30 p.m. Is that about when you would've been sitting outside the hospital?
>
> A: Yes.
>
> Q: Could you tell us what that message says, if you're able to see it?
>
> A: Since y'all want to treat me like a hoe when I told you I didn't want dicked down, don't ever hit me up. Period. And this – that is – I can't see that.

- 11 -

Q: And then to act like nothing happened.

A: Yeah. And then to act like nothing happened. I wasn't even fully awake let alone know Tampa [Evans] touched me. Be glad I ain't being petty. I got all DNA and condoms and messages.

*Id.* at 73; *see also id.* at 73 (wherein the victim testified that Davis called her after this exchange).

Shields testified at trial that, on the night of the rape, she woke up hearing the victim say "stop, get off of me." *Id.* at 122. Shields explained that she was unable to get up to help the victim. *Id.* at 122-23; *see also id.* at 23 (wherein Shields stated, "I could even, like, talk if I wanted to. I tried."). Shields testified that she saw Davis and Evans near the victim. *Id.* at 123-24. Shields testified that, at some time later, she woke up to Evans pulling her own pants down. *Id.* at 124. In the morning, Shields found the victim crying in the shower, and the victim told Shields what had happened. *Id.* at 127-28.

Thus, the record confirms that Davis had expressed interest in a sexual relationship with the victim, and the victim had clearly told Davis that she was not interested in a sexual relationship. The victim testified that she was raped by both Davis and Evans during the night. *See id.* at 59-61; *see also generally Commonwealth v. McDonough*, 96 A.3d 1067, 1069 (Pa. Super. 2014) (noting that "[t]he uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant."). Shields's testimony confirmed that both Davis and Evans were near the victim in the

middle of the night. N.T., 6/5-6/19, at 123-24. Further, the jury heard, and was free to deem credible, the victim's testimony that Evans respresented that Davis had told him it was okay to have sex with her. *See id.* at 69; *see also Steele*, *supra*. From this testimony, along with the messages contained in Commonwealth's Exhibit 1, the jury could reasonably infer that Davis was not merely present at the time of the rape, but in fact shared a criminal intent with Evans.[6] *See Murphy*, *supra*. *Cf. Lambert*, 795 A.2d at 1016 (stating that "[m]ere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient."). Accordingly, the evidence is not "so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Furness*, 153 A.3d at 401. Davis is therefore not entitled to relief on this claim.

In his second claim, Davis asserts that Evans's written statements[7] were improperly introduced at trial, in violation of Davis's Confrontation Clause rights and the rule against hearsay. Brief for Appellant at 21. Davis claims that the statement was made by Evans *after* any alleged conspiracy had ended. *Id.* Davis specifically challenges the following exchange between the

---

[6] Regarding the requirement that co-conspirators commit an overt act in furtherance of their crime, we observe that Davis does not contest the sufficiency of the evidence supporting the rape conviction.

[7] These written statements refer to messages exchanged between Evans and Shields.

ADA and Shields, in which they reviewed the messages entered as Commonwealth's Exhibit 3:

> [ADA]: This is the first page of Exhibit 3. And at the top[,] is ["]Tellemboutdat["] his name?
>
> [Shields]: Yeah.
>
> Q: And that was in you – that's who you knew to be Levi Evans?
>
> A: Yes, that's Tampa.
>
> Q: And then here we have I'm at Sunoco. Actually that's in blue, so that's probably you telling him?
>
> A: That's me saying I was at Sunoco, me and [the victim], to pick him up.
>
> Q: And then he met you at Sunoco, right?
>
> A: Yes.
>
> Q: And then 11:02 a.m., the next day, this is page 2. Can you tell us what your message to [Evans] was?
>
> A: ["]On God, I'm piss off cus she crying cus ya'll played her that weird as fuck truth.["] Excuse my language. And he said how.
>
> Q: Hang on one send [*sic*]. For those of us not familiar with it, weird A-S-F is, your testimony is that's weird as fuck truth?
>
> A: Yes.
>
> Q: And then he said how, and then what did you say?
>
> A: I said ["]cus u ain't asked her to fuck her, you just did.["] And then he said ["]it looks like she – it looks like she cool wit it. U feel, fell asleep n left her now, datz that's weird as fuck truth.["]
>
> Q: He said you left her. You fell asleep and left her, that's weird as fuck truth, right?

A:  Yeah.  And then it said it's weird as fuck I fell asleep I wasn't tryna fuck yesterday at all.  In the beginning I just wanted a cuddle buddy like you told – like I told you before we came to pick you up the fuck so like I said –

Q:  So T-F is the fuck?

A:  Yes.

Q:  Is this – would this be fair to describe as you snapping?

A:  Yes.

Q:  And then is this you saying –

A:  I said that's wild as fuck, she – I said ["]that's wild as fuck like she's bawling.["]  He said ["]tell her I said my fault didn't think she cared.["]  And then I said no we can't – I said ["]no we can't fuck with that.["]  …

*Id.* at 26-27 (citing N.T., 6/5-6/19, 166-68); ***see also*** N.T., 6/5-6/19, at 166 (wherein Commonwealth's Exhibit 3 was admitted into evidence at trial). According to Davis, the messages implicate him in the alleged crime.  Brief for Appellant at 27.  Davis contends that he was unable to cross-examine Evans regarding these statements, or to inquire into the truthfulness of the messages.  *Id.* at 28.

According to Davis, defense counsel objected to the statements based on ***Bruton***, but the trial court found the messages admissible under the co-conspirator exception to the hearsay rule.  *Id.* at 23-24.  Davis claims that because there was no agreement to conceal the crime, any conspiracy ended immediately following the commission of the crime.  *Id.* at 36-37; ***see also*** *id.* at 38 (arguing that "[t]he conspiracy ended when the alleged rape

occurred."). Davis argues that "[t]here is no evidence or showing that [Davis] nor his co-defendant knew or wanted to conceal a crime. In fact, they did not think that a crime occurred because they believed the sexual contact with the victim was consensual." *Id.* at 37.

Significantly, Davis does not contest the rape conviction on appeal. In its Opinion, the trial court concluded that the messages were admissible pursuant to the co-conspirator exception to the rule against hearsay. Trial Court Opinion, 8/12/20, at 12-13.

"'Hearsay' means a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Hearsay is generally inadmissible, unless it satisfies a specifically enumerated exception. *See* Pa.R.E. 802. Here, the trial court concluded that the challenged messages were admissible under Pa.R.E. 803(25)(E), which provides as follows:

> **Rule 803. Exceptions to the Rule Against Hearsay-- Regardless of Whether the Declarant Is Available as a Witness**
>
> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> * * *
>
> **(25) An Opposing Party's Statement.** The statement is offered against an opposing party and:
>
> * * *

> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.
>
> The statement may be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Pa.R.E. 803(25)(E).

> Our Court has explained that,
>
> [u]nder this exception, the out-of-court declarations of a co-conspirator may be introduced against another co-conspirator provided three requirements are satisfied.  First, the prosecution must prove the existence of a conspiracy between the declarant and the defendant against whom the evidence is being offered.  Once this requirement is satisfied, the Commonwealth must show that the statements were made during the course of the conspiracy.  Finally, the Commonwealth must show that the statements were made in furtherance of the common design.

*Commonwealth v. Holton*, 906 A.2d 1246, 1251 (Pa. Super. 2006) (citations omitted).

As we concluded above, the Commonwealth established Davis's participation in a conspiracy with Evans to commit rape of an unconscious person.  Additionally, the record supports the trial court's determination that the conspiracy was ongoing at the time Evans made the statements to Shields.  Further, the statements were made "in furtherance of the common design of evading capture[.]"  *Commonwealth v. Gribble*, 863 A.2d 455, 466 (Pa. 2004) (quoting *Commonwealth v. Coccioletti*, 425 A.2d 387, 392 (Pa. 1981)).  Specifically, Davis and Evans both called the victim, and each had engaged in a speakerphone conversation with Shields, while the victim sat

next to her in the car. *See* N.T., 6/5-6/19, at 65 (wherein the victim testified that Evans and Davis both "were calling my phone asking [the victim] to not press charges."), 73 (wherein the victim testified that Davis called her after they exchanged texts following the incident).[8]

Moreover, as we set forth in detail *supra*, in addressing Davis's first claim, there was sufficient evidence presented at trial to support Davis's conviction of conspiracy to commit rape of an unconscious person, without consideration of the challenged messages. Thus, any error in admitting the messages exchanged between Shields and Evans was harmless. *See Commonwealth v. Wright*, 961 A.2d 119, 143 (Pa. 2008) (explaining that an error may be considered harmless where the error did not prejudice the defendant, or any prejudice was *de minimis*; the erroneously admitted evidence was cumulative of properly admitted evidence; or the properly admitted and uncontradicted evidence of guilty was so overwhelming that the error could not have contributed to the verdict). Thus, Davis is not entitled to relief on this claim.

Judgment of sentence affirmed.

---

[8] Regarding Davis's challenge under *Bruton*, we again observe that it does not appear that Davis and Evans were tried jointly in this matter. *See Commonwealth v. Brown*, 925 A.2d 147, 159 (Pa. 2007) (stating that "*Bruton* is inapplicable to statements made by an individual other than a non-testifying co-defendant at a joint trial of co-defendants." (citation omitted)). Moreover, Evans's statements to Shields did not explicitly implicate Davis. *See* N.T., 6/5-6/19, at 166-68. Evans does not specifically mention Davis's name or reference his involvement in the challenged messages. *See id.*

Judge Olson joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/16/2021