J-S18044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDREW HOLDER, | : | |
| | : | |
| Appellant | : | No. 2848 EDA 2022 |

Appeal from the PCRA Order Entered October 13, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004884-2017

BEFORE:   PANELLA, P.J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                        **FILED JUNE 27, 2023**

Appellant, Andrew Holder, appeals from the October 13, 2022, order entered in the Court of Common Pleas of Philadelphia County, which dismissed Appellant's first petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46, without an evidentiary hearing. Appellant's counsel has filed a petition to withdraw as counsel, and an accompanying **Turner/Finley**[1] brief.   After a careful review, we grant counsel's petition to withdraw and affirm the PCRA court's order.

---

[*] Former Justice specially assigned to the Superior Court.

[1] **See Commonwealth v. Turner**, 518 Pa. 491, 544 A.2d 927 (1988); **Commonwealth v. Finley**, 550 A.2d 213 (Pa.Super. 1988) (*en banc*).

On direct appeal, this Court previously set forth the relevant facts and procedural history, in part, as follows:

[Appellant was arrested in connection with the murder of Darryl "Kwan" Curtis ("the decedent"), and he, along with his co-defendant Jamal Washington ("Washington"), proceeded to a bench trial. At trial, Appellant was represented by Ben Cooper, Esquire.] The trial court offered the following detailed summary of the underlying facts established at Appellant's trial:

On the evening of January 3, 2017, Marcella Vance ("Vance") watched movies with her cousin, Jessica Kidd ("Kidd"), and her paramour, the decedent…, in the back room of her apartment located at [8\*\*9] Erdrick Street in Northeast Philadelphia.  Vance shared the apartment with her roommate, Nashieta Noland ("Noland"), who was present in the front room with her paramour, Washington. At approximately 8:30 p.m., Vance left the apartment to drive Kidd home.  Shortly thereafter, both Noland and Washington left the apartment, leaving the decedent alone inside.

Between 7:52 p.m. and 8:24 p.m., Washington received multiple phone calls from and [*sic*] individual named Robert Thorogood ("Thorogood") and [Appellant].  At 8:24 p.m., Washington called [Appellant].  [Appellant], who was wearing a global position-tracking electronic monitor while under the supervision of the Pennsylvania State Parole Board, traveled to the area of [8\*\*9] Erdrick Street.  There, he and an unidentified individual met Washington, and all three walked in the direction of the apartment, which [Appellant] entered at 9:35 p.m., armed with a pistol.  Inside, [Appellant] searched a safe inside Noland's room and encountered the decedent inside Vance's bedroom. There, he shot and killed the decedent.

Detective Thorsten Lucke, an expert in both video surveillance recovery and cell phone data extraction, recovered video surveillance recordings from private residences at [8\*\*2] and [8\*\*5] Erdrick Street, along with video recorded from a church located at the corner of W[e]lsh and Erdrick Streets. Surveillance footage recovered from the corner of Erdrick and W[e]lsh Streets depicted two vehicles making a left-hand turn from W[e]lsh Street onto Erdrick, in the direction of the apartment.  The camera located at [8\*\*2] Erdrick Street captured video of [Appellant], Washington, and another individual walking down Erdrick Street at 9:32 p.m. towards the decedent's location,

- 2 -

before disappearing from view. At 9:34 p.m., the cameras at [8**2] Erdrick Street recorded…Washington speaking on a cellular device while walking back towards Welsh Street, away from the crime scene. At 9:38 p.m., both cameras captured [Appellant], armed with a pistol, running away from the murder scene with the unidentified individual, with an object consistent with a backpack seen carried in the frame. [Appellant's] positive identity was captured as he ran past the camera located at [8**2] Erdrick Street at 9:39 p.m.

Vance, who had dropped Kidd off at her home before purchasing dinner and cigarettes at other locations, called the decedent at 9:48 p.m. but received no response. Upon entering the apartment less than fifteen minutes later, Vance discovered the decedent's body lying in a pool of blood in the back bedroom. After attempting to give CPR, both Vance and her upstairs neighbor called 911. Philadelphia Police Sergeant Conway and Officer Theodore Brown answered a radio call for an unresponsive male and discovered the decedent's body on location. The decedent was pronounced dead at the scene at 10:19 p.m.

Forensic pathologist Dr. Lindsay Simon performed the decedent's autopsy and determined that the cause of death was a single gunshot wound to the head, and the manner of death was homicide. The projectile entered the decedent's head above the right eyebrow, traveled through his skull and brain, before exiting behind the left ear, causing immediate incapacitation and death. There was no soot or stippling discovered on the body to determine the distance of the shooter.

After calling the police, Vance called Noland, described the bloody crime scene, and asked her to return to the apartment. Washington also returned to the apartment upon Noland's request. All three spoke to detectives at the scene and traveled to the Police Administration Building where they each provided statements, and Washington surrendered his cell phone for further investigation.

Officer Brown inspected the apartment and observed misplaced items in Noland's bedroom, including a gun-cleaning kit and boxes of unfired projectiles, but did not find any signs of forced entry. At 1:10 a.m. on December 4, 201[7], Officer Brian Stark of the Crime Scene Unit arrived at the location and recovered forty-nine bullets of different brands that had been previously stored in Vance's safe. A fired projectile was discovered inside a dresser drawer in Vance's bedroom,

demonstrating that the projectile was fired inside the room. Officer Stark also recovered five latent fingerprints from the crime scene, which he submitted for review. Patrick Raytek, a forensic scientist with the police department's latent print unit, examined all five latent prints and determined that a print lifted from the ammunition box matched [Appellant].

On the morning [after the shooting], Vance returned to the apartment and discovered a fired cartridge casing ("FCC") on the floor between her bed and nightstand. Vance further noticed that the decedent's backpack, which usually contained valuable coins, comic books, and possibly narcotics, was missing from her bedroom. After contacting the police, she returned to the Police Administration Building and provided a second statement, wherein she explained that her ex-husband…previously kept a firearm in the searched safe, but the firearm had been removed from the home prior to the shooting. She further noted that the safe did not contain valuables.

Later that morning, [Appellant's] State Parole Officer…Jacqueline Vaughn discovered an email alerting her that the battery charge of [Appellant's] GPS ankle monitor had fallen below the alert threshold at 8:51 p.m. on the night of the shooting and went into violation at 9:21 p.m. for failure to charge the device. Because the monitor was in violation, it recorded [Appellant's] location every fifteen seconds. Vaugh cross-referenced the GPS information with a map of the city. Her analysis determined that, starting at 9:00 p.m., [Appellant] traveled from Wissahickon Avenue and onto Roosevelt Boulevard, towards the crime scene. GPS records further revealed that [Appellant] arrived on Erdrick Street at 9:32 p.m. and remained until 9:44 p.m. The GPS monitor tracked [Appellant's] location as he returned home between 9:44 p.m. and 10:11 p.m., whereupon he began charging the device above the alert threshold.

The next day, Vaughn watched a news program reporting the decedent[']s murder in his apartment on Erdrick Street. After reviewing her report showing [Appellant] at the location at the time of the shooting, Vaughn contacted homicide detectives.

David Webb, an account manager with Attendi Electronic Monitoring, the company that manufactures and stores records for [Appellant's] GPS monitor, reviewed the data associated with [Appellant's] device from the night of the murder. In his analysis, Webb noted that, while the device can pinpoint a user's location to within a ten-foot range of accuracy, movement of that device,

or interference by entering a building, can decrease that range of accuracy to an inconclusive level of 100 feet.

GPS location records kept in the course of ordinary business demonstrated that at 9:31:35 p.m., [Appellant's] device recorded his location at [8\*\*7] Erdrick Street. At 9:32:35 p.m., [Appellant] was walking outside [8\*\*8] Erdrick Street, towards the decedent's location at [8\*\*9] Erdrick Street at a speed of three miles per hour. [Appellant] continued past [8\*\*4] Erdrick Street before reaching [8\*\*5] Erdrick Street at 9:34:35 p.m. At [8\*\*5] Erdrick Street, the device's range of accuracy decreased to fifty-six feet, indicating that [Appellant] was inside a building. Between 9:35:38 p.m. and 9:37:35 p.m., the device identified [Appellant's] location at [8\*\*9] Erdrick Street, with decreasing ranges of accuracy from seventy-nine feet to ninety-three feet, and ultimately reaching inconclusive levels beyond 100 feet, demonstrating his presence inside a building. By 9:40 p.m., the device began recording [Appellant's] location moving away from [8\*\*9] Erdrick Street with increasing levels of accuracy, before being plugged in at 10:11 p.m. and coming to rest at 11:57 p.m.

Detective Lucke completed a call detail record report on the cellular device attributed to Washington on June 7, 2017, which revealed a series of phone calls between his device and those attributed to [Appellant] and Thorogood. At 7:53 p.m., Thorogood placed a call to Washington, lasting fifteen seconds. At 7:54 and 7:57 p.m., [Appellant] left voicemails with Washington, who responded with an outgoing call to [Appellant] at 8:24 p.m. Washington and [Appellant] next communicated at 9:21 p.m., before the instant shooting. Washington next placed several calls to [Appellant] between 9:40 p.m. and 9:41 p.m., and again between 10:01 p.m. and 10:09 p.m. that evening. In total, Washington's device recorded twenty-six communications between devices associated with Washington and [Appellant], all of which occurred within the time frame immediately before and after the murder.

Detective Lucke's analysis further revealed that, in the aftermath of the instant shooting, Washington deleted from his cell phone all records of his communications with [Appellant] and Thorogood that evening. Cell phone data extraction permitted Detective Lucke to recover some, but not all, of their communications.

Detective James Dunlap, an expert in cellular tower analysis, reviewed data from towers located at [8\*\*6] Erdrick

- 5 -

Street and .6 miles away from the crime scene on Interstate-95, and he identified numerous connection[s] between Washington's device and those towers between 8:04 p.m. and 9:54 p.m. on the night of the murder. Additional connections depicted Washington's device making two connections at a tower located at Rhawn Street and Roosevelt Boulevard, 1.5 miles away from the crime scene. Nine Connections between 10:06 p.m. and 10:10 p.m. show the device traveling along Roosevelt Boulevard before making a connection with the tower at [18*1] West Allegheny Avenue, which is associated with Washington's home address at [19*1] West Willard Street. Analysis of the device associated with [Appellant] (215-8**-7***) showed that it connected to the tower associated with the crime scene numerous times between 9:25 p.m. and 10:08 p.m. Analysis of the device associated with Thorogood revealed that the device was not in the area of the crime scene…at the time of the shooting.

*Commonwealth v. Holder*, No. 891 EDA 2020, 2021 WL 2105031, at *1-5 (Pa.Super. filed 5/25/21) (unpublished memorandum) (quoting Trial Court Opinion, filed 6/22/20, at 2-7).

At the conclusion of the bench trial, on December 4, 2019, the trial court convicted Appellant of third-degree murder, burglary, and conspiracy to commit burglary. The trial court sentenced Appellant on February 12, 2020, to an aggregate of seventeen and one-half years to thirty-five years in prison. After the trial court denied Appellant's timely post-sentence motion, Appellant filed a counseled notice of appeal.

Relevantly, on direct appeal, Appellant alleged the Commonwealth committed a *Brady*[2] violation by failing to disclose the address of potential

---

[2] *Brady v. United States*, 397 U.S. 742 (1969).

witness Gerald Morrison prior to trial.[3] In finding no relief was due, this Court

relevantly indicated the following:

> Appellant contends that the Commonwealth committed a ***Brady*** violation by willfully failing to disclose the address of potential witness Gerald Morrison. The trial court denied relief on the claim, holding that Appellant demonstrated neither that the Commonwealth suppressed evidence nor that he was prejudiced. It explained as follows:
>
>> At trial, Appellant called witness Kyle Page ("Page"), who testified that on February 4, 2017, he received a text message from Morrison. Detective Jeffrey Burke interviewed Page and read the text message, which said that Morrison shot "that dude D" in the Holmesburg section of Philadelphia four weeks prior, matching the date and general location of the instant murder. On October 31, 2020, in preparation for trial, Detective Burke spoke to Morrison at his known address and documented the interview on his activity sheet, which was provided to the defense.
>>
>> On the last day of trial, defense counsel informed th[e] [trial] court that he intended to subpoena Morrison, but Morrison's address was missing from the activity sheet, preventing him from doing so. In response, the Commonwealth explained that Morrison's name was included in discovery, which was provided to counsel at the time the matter was scheduled for trial. The Commonwealth had not subpoenaed Morrison for trial, and until Detective Burke's testimony the day before, the defense had not requested Morrison's address.
>>
>> Based on the totality of the above circumstances, it is clear that the Commonwealth did not suppress Morrison's address to prevent his testimony, and [Appellant] cannot demonstrate prejudice. Morrison was identified as a potential witness within discovery, granting the defense an

---

[3] Appellant also presented on direct appeal sufficiency and weight of the evidence challenges, as well as contended the trial court abused its discretion in imposing an excessive sentence. This Court found no merit to these claims.

opportunity to interview him in preparation for trial. Though the copy of the activity sheet did not include Morrison's address, the address could have been obtained by defense counsel upon request, and defense counsel did not make such a request until after trial commenced.

Moreover, [Appellant] fails to show how Morrison's testimony would have altered the result of the proceedings. While examining witness Page on direct, the defense elicited that Morrison sent Page an incriminating message one month after the shooting. Through its examination of Detective Burke, the defense further elicited the contents of that message, which implied that Morrison took credit for killing an individual named "D" at the time and location of the instant homicide.

Th[e] [trial] court balanced the possibility of Morrison's involvement with the other direct and circumstantial evidence presented at trial. While video evidence establishes that [Appellant] arrived at [8**9] Erdrick Street with an unidentified individual, having Morrison possibly identified as that individual would not alter the instant verdict, as video surveillance evidence identifying [Appellant], GPS data tracking him, and fingerprint recovery identifying him as having been present in the home, all unequivocally establish [Appellant's] involvement in and guilt of the instant offense. Not only did the absence of Morrison's address-information that was readily available to the defense upon request-from discovery fail to change the outcome of this case, but it fails to tarnish the fairness of the trial itself. For those reasons, the instant claim fails.

Trial Court Opinion, filed 6/22/20, at 9-10.

We conclude the trial court's analysis is sound. The case law relied upon by Appellant in supporting his claim relates to instances in which the Commonwealth failed to disclose the very existence of a potentially exculpatory witness.

Here, it is undisputed that the Commonwealth timely identified Morrison as a potential witness. It was Appellant's failure to follow up on the information duly supplied by the Commonwealth that resulted in his inability to procure a

statement or testimony from Morrison. Appellant tacitly concedes in his brief that his real claim sounds in ineffectiveness of counsel for his failure to investigate Morrison. However,…that claim is properly raised not on direct appeal, but in post-conviction collateral proceedings. As Appellant has not established that he suffered prejudice as a result of the Commonwealth's suppression of favorable evidence, his *Brady* claim does not warrant relief.

*Holder*, No. 891 EDA 2020, 2021 WL 2105031, at *17-19 (citations omitted).

Accordingly, this Court affirmed Appellant's judgment of sentence on May 25, 2021. Appellant did not file a petition for allowance of appeal with our Supreme Court.

On April 26, 2022, Appellant filed a timely, counseled PCRA petition, and on September 9, 2022, the PCRA court[4] provided Appellant with notice of its intent to dismiss under Pa.R.Crim.P. 907. Appellant did not file a response, and by order and opinion entered on October 13, 2022, the PCRA court denied Appellant's PCRA petition.

This timely, counseled notice of appeal followed on November 6, 2022.[5] The PCRA court did not direct Appellant to file a Pa.R.A.P. 1925(b) statement, and, thus, Appellant did not file such a statement. On March 7, 2023,

---

[4] We note the Honorable Barbara A. McDermott was the trial court judge who sat for Appellant's bench trial, and she was also the PCRA court judge in the instant matter.

[5] Justin Charles Capek, Esquire, filed the PCRA petition on behalf of Appellant; however, after the PCRA court denied the petition, Attorney Capek was given permission to withdraw. The PCRA court then appointed Gary S. Server, Esquire, who filed the notice of appeal to this Court on behalf of Appellant.

Appellant's counsel, Attorney Server, filed with this Court an application to withdraw and an accompanying **Turner/Finley** brief.[6]

Prior to reviewing the merits of this appeal, we first determine whether PCRA counsel has fulfilled the procedural requirements for withdrawing as counsel. **Commonwealth v. Daniels**, 947 A.2d 795, 797 (Pa.Super. 2008). Our Supreme Court has stated that competent counsel must independently review the record before withdrawal shall be permitted. **See Turner**, **supra**. Independent review requires counsel to review the case zealously. **Commonwealth v. Mosteller**, 633 A.2d 615, 617 (Pa.Super. 1993). Counsel must then submit a "no-merit" letter or brief on appeal to this Court, listing the issues which the petitioner wants reviewed, explaining how and why those issues lack merit, detailing the nature and extent of counsel's diligent review of the case, and requesting permission to withdraw. **Commonwealth v. Karanicolas**, 836 A.2d 940, 947 (Pa.Super. 2003).

> Counsel must also send to the petitioner: (1) a copy of the "no-merit" letter/brief; (2) a copy of counsel's petition to withdraw; and (3) a statement advising petitioner of the right to proceed *pro se* or by new counsel.
>
> ***
>
> Where counsel submits a petition and no-merit letter that...satisfy the technical demands of **Turner/Finley**, the court—trial court or this Court—must then conduct its own review of the merits of the case. If the court agrees with counsel that the claims are without merit, the court will permit counsel to withdraw and deny relief.

---

[6] Appellant has not filed a *pro se* brief or a brief with privately retained counsel.

- 10 -

***Commonwealth v. Muzzy***, 141 A.3d 509, 511 (Pa.Super. 2016) (quoting ***Commonwealth v. Doty***, 48 A.3d 451, 454 (Pa.Super. 2012)).

Instantly, PCRA counsel, Attorney Server, has complied with the procedural requirements. Specifically, Attorney Server forwarded to Appellant his petition to withdraw and a copy of his ***Turner/Finley*** brief, which details his zealous review of the record and review of the issues Appellant raised in his PCRA petition, why he believes the issues Appellant raised are meritless, and a letter explaining to Appellant his right to proceed *pro se* or with new counsel. Therefore, we may proceed to an independent review of the appeal.

On appeal, counsel raises in the ***Turner/Finley*** brief the issue of whether "trial counsel was ineffective for failing to investigate and call Gerald Morrison as a [defense] witness at trial?" ***Id.*** at 6. Initially, we note the following well-established applicable legal precepts:

Our standard of review for an order denying PCRA relief is limited to whether the record supports the PCRA court's determination, and whether that decision is free of legal error. ***Commonwealth v. Sattazahn***, 597 Pa. 648, 952 A.2d 640, 652 (2008). "We must accord great deference to the findings of the PCRA court, and such findings will not be disturbed unless they have no support in the record." ***Commonwealth v. Scassera***, 965 A.2d 247, 249 (Pa.Super. 2009) (citation omitted).

As relevant here, a PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence

- 11 -

resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). In reviewing Appellant's ineffective assistance of counsel claim, we are mindful that, since there is a presumption counsel provided effective representation, the defendant bears the burden of proving ineffectiveness. *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282 (2010). To prevail on an ineffective assistance claim, a defendant must establish "(1) [the] underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his [client's] interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Id.*, *supra*, 10 A.3d at 291 (citations omitted).

> We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. [C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Johnson*, 635 Pa. 665, 139 A.3d 1257, 1272 (2016) (citations omitted). *See Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009) ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.") (citation omitted)). "A claim has arguable merit where the factual averments, if accurate, could

establish cause for relief." ***Commonwealth v. Stewart***, 84 A.3d 701, 707 (Pa.Super. 2013) (*en banc*) (citation omitted).

Further,

> To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

***Commonwealth v. Spotz***, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted). ***See Commonwealth v. Gribble***, 580 Pa. 647, 863 A.2d 455, 472 (2004) ("[A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it could have reasonably had an adverse effect on the outcome of the proceedings.") (quotation omitted)).

With regard to the failure to investigate potential witnesses, our Pennsylvania Supreme Court has held as follows:

> Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary....The duty to investigate...may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance....
>
> [W]here there is a limited amount of evidence of guilt, it is *per se* unreasonable not to attempt to investigate and interview known eyewitnesses in connection with defenses that hinge on the credibility of other witnesses....

- 13 -

> [S]uch a *per se* failing as to performance, of course, does not make out a case of prejudice....

***Commonwealth v. Johnson***, 600 Pa. 329, 966 A.2d 523, 535-36 (2009)

(citations omitted).

Further, this Court has held:

> [A] failure to investigate and interview a witness claim overlaps with declining to call a witness since the petitioner must prove: (i) the witness existed; (ii) the witness was available to testify; (iii) counsel knew of, or should have known of, the existence of the witness; (iv) the witness was willing to testify; and (v) the absence of the testimony was so prejudicial as to have denied the defendant a fair trial.

***Commonwealth v. Pander***, 100 A.3d 626, 638-39 (Pa.Super. 2014) (*en banc*) (quotation marks and quotation omitted). To demonstrate prejudice, a petitioner "must show how the uncalled witness's testimony would have been beneficial under the circumstances of the case." ***Commonwealth v. Gibson***, 597 Pa. 402, 951 A.2d 1110, 1134 (2008).

Here, in finding no relief is due, the PCRA court relevantly indicated the following:

> At trial, [Appellant's] trial counsel called Page, who testified that he received a text message from Morrison on January 3, 2017, the night of the decedent's murder. N.T., 12/3/19, at 228-29, 251. Detective Jeffrey Burke, who interviewed Page on February 4, 2017, read the text message into the record[.] [The text message] stated that Morrison shot "the dude D" in the Holmesburg section of Philadelphia. ***Id.*** at 265-68. The text message's contents matched the date, details, and general location of the decedent's murder.
>
> Detective Burke testified [at trial] that he was unable to trace the text message or the phone number which sent the message back to Morrison. ***Id.*** at 275. The only evidence which

- 14 -

connected Morrison to the phone number that sent the text message was the testimony of Page. Detective Burke noted that he had concerns about Page's credibility due to his prior record. *Id.* at 262, 265-67. There were no other messages from the phone number sent to Page before or after the text message allegedly sent by Morrison. The phone number also did not have any communications or appear in the cell phone records of [Appellant], the decedent, or [Appellant's] co-defendant, Washington. *Id.* at 275-77.

On October 31, 2019, in preparation for trial, Detective Burke located Morrison at his address and interviewed him. During this interview, Morrison stated that he did not know [Appellant], the decedent, or Washington. Morrison also told police that he did not recognize the phone number which sent the text message to Page. Detective Burke documented the interview on an activity sheet dated November 19, 2019, which was provided to the defense within a week with Morrison's address redacted. *Id.* at 267-73.

On the final day of trial, trial counsel informed [the trial] court that he attempted to subpoena Morrison the day before trial, but [he] was unable to serve him. N.T., 12/4/19, at 2. Trial counsel stated that his investigator was unable to locate Morrison at the address, which had just been provided to him by Detective Burke. Trial counsel then acknowledged that, even if Morrison did appear, it was not likely that he would be willing to testify as "[i]t would be safe to say…that Mr. Morrison would take the Fifth Amendment if called to testify about these text messages." *Id.* at 2-3. Consequently, trial counsel did not request a continuance to further attempt to locate Morrison.

\*\*\*

Although [Appellant] is able to show that the witness (Morrison) existed and counsel knew of the witness prior to trial, [Appellant] has failed to establish that Morrison was available and willing to testify for the defense and that the absence of Morrison's testimony was so prejudicial that it denied him a fair trial. [Appellant] alleges that the fact that Morrison voluntarily spoke with police on October 31, 2019, shows that he was available and willing to testify. However, during his interview with police, Morrison denied any knowledge of [Appellant], Washington, the decedent, or the [incriminating] text message.

At the time [Appellant] filed the instant [PCRA] petition, he was unable to locate Morrison so, in June of 2022, the [PCRA]

court provided [Appellant's] PCRA counsel with three months to locate him and amend the instant petition. On September 8, 2022, [Appellant's] PCRA counsel informed [the PCRA] court that he had located and spoken with Morrison, but [Morrison] refused to cooperate or provide an affidavit.

The evidence provided to [the PCRA] court establishes that Morrison is not willing to testify at this point and would not have been willing to testify at trial. Even after being located by PCRA counsel, Morrison refused to give a statement or [proffer] testimony about what he would have testified to at trial if he had been located at that time. Therefore, [Appellant's] claim fails as he did not produce any evidence that Morrison would have been willing to testify on his behalf at trial. *See Commonwealth v. Selenski*, 228 A.3d 8, 17 (Pa.Super. 2020) (the appellant's failure to demonstrate that his co-conspirator was willing to testify for the defense was fatal to his PCRA claim of ineffective assistance of trial counsel for failing to call the co-conspirator as a witness).

Furthermore, on direct appeal, both the [trial] court and the Superior Court denied [Appellant's] *Brady* claim alleging that the Commonwealth withheld Morrison's address[.] [Notably, both courts] found that [Appellant] was not prejudiced by the absence of Morrison's testimony at trial. [The trial] court concluded and the Superior Court agreed that:

> [Appellant] fails to show how Morrison's testimony would have altered the result of the proceeding. While examining witness Page on direct, the defense elicited [evidence] that Morrison sent Page an incriminating message one month after the shooting. Through its examination of Detective Burke, the defense further elicited the contents of that message, which implied that Morrison took credit for killing an individual named "D" at the time and location of the instant homicide.

> The court balanced the possibility of Morrison's involvement with the other direct and circumstantial evidence presented at trial. While video evidence establishes that [Appellant] arrived at [8**9] Erdrick Street with an unidentified individual, having Morrison possibly identified as that individual would not alter the instant verdict, as video surveillance evidence identifying [Appellant], GPS data tracking him, and fingerprint recovery identifying him as having been

- 16 -

present in the home, all unequivocally establish [Appellant's] involvement in and guilt of the instant offenses. Not only did the absence of Morrison's address—information that was readily available to the defense upon request—from discovery fail to change the outcome of this case, but it fails to tarnish the fairness of the trial itself. For those reasons, the instant claim fails.

**Holder**, No. 891 EDA 2020, [2021 WL 2105031,] at *9-10.

There is no genuine issue of material fact which necessitates a hearing in this case. Even if Morrison was available and willing to testify at trial, [Appellant's] conviction would still be upheld. [The trial] court heard the testimony regarding the contents of the text message and still convicted [Appellant]. [Given the] overwhelming evidence put forth at trial[,] [Appellant cannot demonstrate that the absence of Morrison's testimony was so prejudicial as to have denied Appellant a fair trial.]

PCRA court Opinion, filed 10/13/22, at 7-11 (footnote omitted).

We agree with the PCRA court's sound reasoning. Specifically, Appellant has failed to demonstrate that Morrison was willing to testify favorably for Appellant. **See Pander**, **supra**. Moreover, as the PCRA court noted, assuming, *arguendo*, Morrison testified at trial that he sent the incriminating text to Page, and he was the unidentified individual who accompanied Appellant during the home invasion, the absence of this testimony was not so prejudicial as to have denied Appellant a fair trial. **See id.** Given the overwhelming evidence of Appellant's guilt, Appellant has not demonstrated there is a reasonable probability that, but for counsel's errors, the result of his trial would have been different. **See Spotz**, **supra**. Thus, we conclude Appellant is not entitled to relief on his claim of ineffective assistance of counsel.

After conducting our independent review, we are in agreement with counsel that there is no basis for relief in the present case. ***See Commonwealth v. Wrecks***, 931 A.2d 717, 721 (Pa.Super. 2007). Accordingly, we affirm the PCRA court's dismissal of Appellant's PCRA petition, and we grant counsel's petition to withdraw.

Order affirmed. Counsel's petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2023